**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**(BROOKLYN)**

| | | |
|---|---|---|
| IN RE: EXACTECH POLYETHYLENE ORTHOPEDIC PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) ) ) | MDL No. 3044 (NGG) (MMH) |
| | | Case No.: 1:22-md-3044-NGG-MMH |
| | | District Judge Nicholas G. Garaufis Magistrate Judge Marcia M. Henry |
| THIS DOCUMENT RELATES TO: ALL CASES AGAINST TPG DEFENDANTS | | |

**DEFENDANTS TPG INC.; OSTEON HOLDINGS, INC.; OSTEON MERGER SUB, INC.; AND OSTEON I INTERMEDIATE HOLDINGS II, INC.'s**
**<u>MEMORANDUM IN SUPPORT OF MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

Page

I.    BACKGROUND ...................................................................................................2

    A.    Exactech designed, manufactured, packaged, and sold the relevant hip, knee, and ankle devices before (and without) any alleged TPG involvement...................................................................................................2

    B.    In late 2017, Exactech merged with Osteon Merger Sub, Inc.—not TPG Inc.—in an arm's length transaction. ..................................................................3

    C.    Exactech operates independently from TPG post-merger. ...................5

    D.    Recognizing the weakness of their allegations as to TPG, Plaintiffs sought pre-motion discovery, which the Court denied.....................................................6

II.   LEGAL STANDARD ..........................................................................................6

III.  PLAINTIFFS FAIL TO STATE A VEIL-PIERCING CLAIM....................................7

    A.    Delaware or Florida law—which are consistent for purposes of veil-piercing analysis—apply to the vast majority of cases against TPG. ...................7

    B.    Plaintiffs fail to plead the "extraordinary" allegations required for the "exceptionally rare" right to pierce the corporate veil...........................................8

IV.   PLAINTIFFS FAIL TO STATE A SUCCESSOR LIABILITY CLAIM ................21

    A.    Relevant successor liability principles are largely universal. ..............................21

    B.    Plaintiffs have not pled that *any* TPG Defendant is a successor.........................23

V.    CONCLUSION ..................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Akerblom v. Ezra Holdings Ltd.*,
    848 F. Supp. 2d 673 (S.D. Tex. 2012) ................................................................... 16

*Aldana v. Fresh Del Monte Produce, Inc.*,
    2007 WL 7143959 (S.D. Fla. Aug. 30, 2007) ....................................................... 21

*Anschutz Corp. v. Merrill Lynch & Co.*,
    690 F.3d 98 (2d Cir. 2012) .......................................................................................7

*Asarco, LLC v. Union Pac. R.R. Co.*,
    2017 WL 639628 (D. Idaho Feb. 16, 2017) .......................................................... 21

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..................................................................................................6

*Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*,
    159 F.3d 358 (9th Cir. 1997) .................................................................................. 21

*In re Autobacs Strauss, Inc.*,
    473 B.R. 525 (Bankr. D. Del. 2012) ...................................................................... 17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................................6

*Bentivoglio v. Event Cardio Grp., Inc.*,
    2019 WL 6341130 (S.D.N.Y. Nov. 27, 2019) ......................................... 10, 13, 21

*Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*,
    491 B.R. 335 (S.D.N.Y. 2013) ............................................................................9, 16

*Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*,
    752 A.2d 1175 (Del. Ch. 1999) .......................................................................... 10, 18

*Century Sr. Servs. v. Consumer Health Ben. Ass'n, Inc.*,
    770 F. Supp. 2d 1261 (S.D. Fla. 2011) ................................................... 11, 12, 13

*In re Checiek*,
    492 B.R. 918 (Bankr. M.D. Fla. 2013) ....................................................................8

*In re Chocolate Confectionary Antitrust Litig.*,
    674 F. Supp. 2d 580 (M.D. Pa. 2009) ................................................................ 19, 20

*Classic Soft Trim, Inc. v. Albert*,
2020 WL 6734402 (M.D. Fla. Aug. 13, 2020) ............................................................ 19, 20

*Dania Jai-Alai Palace, Inc. v. Sykes*,
450 So. 2d 1114 (Fla. 1984) ........................................................................................ 9, 21

*In re Digit. Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y 2011) ................................................................................ 21

*Doberstein v. G-P Indus., Inc.*,
2015 WL 6606484 (Del. Ch. Oct. 30, 2015) ............................................................ 10, 12

*Dole Food Co. v. Patrickson*,
538 U.S. 468 (2003) .............................................................................................................. 9

*Drewes v. Cetera Fin. Grp., Inc.*,
2020 WL 13566405 (S.D. Fla. July 9, 2020) ...................................................................... 8

*EnduraCare Therapy Mgmt., Inc. v. Drake*,
681 S.E.2d 168 (Ga. App. 2009) ........................................................................................ 8

*Erben v. Raymond James Eur. Holdings, Inc.*,
2012 WL 12874586 (M.D. Fla. Apr. 10, 2012) .................................................................. 9

*Burtch ex rel. Estate of Opus E., L.L.C. v. Opus, L.L.C. (In re Opus E., L.L.C.)*,
480 B.R. 561 (Bankr. D. Del. 2012) ................................................................................. 11

*First Bank of Delaware v. LeanSpa LLC*,
2012 WL 924877 (D. Del. Mar. 19, 2012) ....................................................... 1, 17, 18, 22

*Fletcher v. Atex, Inc.*,
68 F.3d 1451 (2d Cir. 1995) ............................................................................................... 13

*In re Fundamental Long Term Care, Inc.*,
507 B.R. 359 (Bankr. M.D. Fla. 2014) ............................................................................. 10

*Gamm v. Sanderson Farms, Inc.*,
944 F.3d 455, 462 (2d Cir. 2019) ........................................................................................ 3

*Garcia v. Gravity Interactive, Inc.*,
2012 WL 13005342 (S.D. Fla. Jan. 17, 2012) ............................................................ 14, 15

*Harvest Food Grp., Inc. v. Newport Int'l of Tierra Verde, Inc.*,
2008 WL 4927006 (S.D. Fla. Nov. 17, 2008) ................................................................... 17

*In re HH Liquidation, LLC*,
590 B.R. 211 (Bankr. D. Del. 2018) ................................................................................... 9

*Howard v. Clifton Hydraulic Press Co.*,
    830 F. Supp. 708 (E.D.N.Y. 1993) ...................................................... 22

*Lopez v. Delta Int'l Mach. Corp.*,
    2017 WL 3142028 (D.N.M. July 24, 2017)........................................ 16

*Lopez v. Stanley Black & Decker, Inc.*,
    764 F. App'x 703 (10th Cir. 2019) ..................................................... 16

*Magnolia Techs. Corporation's Counterclaim Against Guarantee Tr. Life Ins. Co. and Century Senior Servs.*,
    2010 WL 3922681 (S.D. Fla. Aug. 19, 2010).............................. 11, 13

*Manichaean Cap., LLC v. Exela Techs., Inc.*,
    251 A.3d 694 (Del. Ch. 2021)............................................ 11, 12, 13, 14

*Mayor & City Council of Balt, Md. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)................................................................. 6

*Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*,
    288 F.3d 1264 (11th Cir. 2002) .......................................................... 19

*Merkin v. PCA Health Plans of Fla., Inc.*,
    855 So. 2d 137 (Fla. Dist. Ct. App. 2003) ......................................... 17

*Miami Prods. & Chem. Co. v. Olin Corp.*,
    449 F. Supp. 3d 136 (W.D.N.Y. 2020) ............................................... 19

*Nieves v. Insight Bldg. Co., LLC*,
    2020 WL 4463425 (Del. Ch. Aug. 4, 2020) ........................... 2, 8, 14, 15

*Norfolk S. Ry. Co. v. Pittsburgh & W. Va R.R.*,
    153 F. Supp. 3d 778 (W.D. Pa. 2015), *aff'd*, 870 F.3d 244 (3d Cir. 2017) .................... 23, 24

*Omar v. 1 Front St. Grimaldi, Inc.*,
    2018 WL 2121550 (E.D.N.Y. May 8, 2018) ...................................... 23

*Pinnacle Foods of Cal., LLC v. Popeyes La. Kitchen, Inc.; Rest. Brands Int'l, Inc.*,
    2022 WL 17736190 (S.D. Fla. Dec. 16, 2022) ............................. 18, 19

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
    507 F.3d 117 (2d Cir. 2007)................................................................. 7

*PR Acquisitions, LLC v. Midland Funding LLC*,
    2018 WL 2041521 (Del. Ch. Apr. 30, 2018) ....................................... 8

*Prewett Enters., Inc. v. Grand Trunk W. R.R. Co.*,
2019 WL 6310495 (N.D. Ill. Nov. 25, 2019) ....................................................... 15

*Principal Growth Strategies, LLC v. AGH Parent LLC*,
288 A.3d 1138 (Del. Ch. 2023) ........................................................................... 8

*Ray v. Jud. Corr. Servs., Inc.*,
2018 WL 2130408 (N.D. Ala. May 9, 2018) ................................................. 23, 24

*Riad v. Porsche Cars N. Am., Inc.*,
2023 WL 2227692 (E.D. Pa. Feb. 24, 2023) ....................................................... 19

*Robertson-Ceco Corp. v. Cornelius*,
2007 WL 1020326 (N.D. Fla. Mar. 30, 2007) ...................................................... 8

*Ronnoco Coffee, LLC v. Westfeldt Brothers, Inc.*,
2017 WL 635491 (E.D. Mo. Feb. 16, 2017), *aff'd*, 939 F.3d 914 (8th Cir.
2019) ............................................................................................................. 20, 22

*Ross Prods. Div. Abbott Lab'ys Inc. v. Saper*,
2007 WL 1288125 (E.D.N.Y. Apr. 26, 2007) .................................................... 20

*Secon Serv. Sys., Inc. v. St. Joseph Bank & Tr. Co.*,
855 F.2d 406 (7th Cir. 1988) ............................................................................... 7

*In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial
Proc.*,
2017 WL 4772759 (N.D. Ill. Oct. 23, 2017) ...................................................... 22

*Tomlinson v. Combined Underwriters Life Ins. Co.*,
2009 WL 2601940 (N.D. Okla. Aug. 21, 2009) ................................................... 7

*Trustees, Vill. of Arden v. Unity Constr.*,
2000 WL 130627 (Del. Ch. Jan. 26, 2000) ........................................................ 14

*U.S. v. Golden Acres, Inc.*,
702 F. Supp. 1097 (D. Del. 1988) ................................................................. 10, 21

*United States Small Bus. Admin. v. Feinsod*,
347 F. Supp. 3d 147 (E.D.N.Y. 2018) ................................................................. 4

*United States v. Bestfoods*,
524 U.S. 51 (1998) ............................................................................................. 19

*Variable Annuity Life Ins. Co. (VALIC) v. Dull*,
2009 WL 3064750 (S.D. Fla. Sept. 22, 2009) .................................................... 16

*Verdantus Advisors, LLC v. Parker Infrastructure Partners, LLC*,
   2022 WL 611274 (Del. Ch. Mar. 2, 2022)...................................................................*passim*

*In re Welding Fume Prod. Liab. Litig.*,
   2010 WL 2403355 (N.D. Ohio June 11, 2010)............................................................*passim*

**Rules**

Rule 12(b)(6).......................................................................................................................... 6

**Other Authorities**

14A Fletcher Cyc. Corp. § 7011 .......................................................................................... 24

15 Fletcher Cyc. Corp. § 7121 ..........................................................................2, 21, 22, 23

Restatement (Third) of Torts: Prod. Liab. § 12, Comment (b) (1998) ........................................ 25

Plaintiffs' claims against Defendants TPG Inc.; Osteon Holdings, Inc.; Osteon Merger Sub, Inc.; and Osteon Intermediate Holdings II, Inc. (collectively, "TPG") threaten to turn corporate veil-piercing and successor liability on their heads. Plaintiffs claim that TPG Inc.—an alternative asset management firm (which holds an interest in entities commonly referred to as private equity funds) with ownership stakes in more than 300 portfolio companies around the world—can be dragged into expansive, multi-district product liability litigation because one of those portfolio companies includes Defendants Exactech, Inc. and Exactech US ("Exactech"). But Plaintiffs' efforts to make TPG a defendant in its case against Exactech are bereft of legal support. Plaintiffs allege nothing more than a typical owner-portfolio company relationship, which is "not the exceptionally rare" case where indirect liability applies. *See, e.g.*, *Verdantus Advisors, LLC v. Parker Infrastructure Partners, LLC*, 2022 WL 611274, at *2 (Del. Ch. Mar. 2, 2022) (refusing to pierce the corporate veil where plaintiffs' "allegation[s] could be said of most" similarly-situated corporate relationships, "not the exceptionally rare stuff of veil-piercing").

***First***, Plaintiffs' veil-piercing theory must overcome a strong presumption against it: that a subsidiary's acts are not attributable to its parent. Plaintiffs fail to do so here. Their allegations do not satisfy ***any*** of the relevant factors courts consider in assessing this "extraordinary" claim: they do not allege that Exactech is not properly capitalized or solvent, fails to maintain corporate formalities, had its funds "siphoned" by the parent, or is no more than a façade for the parent. *Id*. And even alleging one factor would not be enough; plaintiffs must plead "some combination" of them. *Id.* Indeed, in *Verdantus*, observing that veil piercing is "exceptionally rare" and "a tough thing to plead and a tougher thing to get," Chancellor McCormick dismissed veil-piercing claims even where the plaintiff alleged that the defendant was inadequately capitalized, siphoned funds, and observed "few if any corporate formalities." *Id*.

Here, Plaintiffs do not allege that *any* factor applies. Their allegations demonstrate just the opposite—that Exactech is an independent, fully-funded, solvent company—not a "façade" for TPG. Plaintiffs allege Exactech received $737 million in the merger, seek damages from Exactech, and never claim Exactech is undercapitalized. There is also no dispute that Exactech and TPG maintain corporate formalities: Plaintiffs plead different headquarters, management teams, and purposes. Finally, there is no suggestion that Exactech "exist[s] for no other purpose than as a vehicle for fraud" perpetrated by TPG—the *sine qua non* of any veil-piercing claim. *Nieves v. Insight Bldg. Co., LLC*, 2020 WL 4463425, at *8 (Del. Ch. Aug. 4, 2020). At bottom, Plaintiffs allege a typical private equity fund and portfolio company relationship—nothing more. That is not enough to meet the extraordinarily high bar necessary to pierce the corporate veil.

***Second***, Plaintiffs' successor liability allegations fare no better. Successor liability applies when one company goes out of business, another company (*i.e.*, its successor) survives, and a plaintiff wants to hold the successor liable for the defunct business's alleged wrongs. *See* 15 Fletcher Cyc. Corp. § 7121. This doctrine is wholly inapplicable here. Exactech still operates today and is a ***Defendant in this litigation***. Successor liability simply does not apply.

There can be no real dispute that Plaintiffs' case centers around ***Exactech***: its design, packaging, product, and product recall decisions. Plaintiffs strain to come up with reasons to pull TPG into this litigation—and despite two theories, they cannot meet the law's high bar. The Amended Complaint against TPG should be dismissed with prejudice.

## I.    BACKGROUND

### A.    Exactech designed, manufactured, packaged, and sold the relevant hip, knee, and ankle devices before (and without) any alleged TPG involvement.

Plaintiffs' claims revolve around the design, manufacture, packaging, and distribution of the "Exactech Hip, Knee, and Ankle Devices." Amended Complaint ("AC") (ECF No. 164) ¶ 2.

Exactech began selling hip replacement devices in the 1980s. *Id.* ¶ 72. The products at issue in this litigation include Exactech designs going as far back as 1994—decades before many of the TPG Defendants even existed. *Compare id.* ¶ 75 *with id.* ¶ 26. Indeed, for **every single one** of the devices at issue, Exactech had already designed and begun to manufacture, package, and distribute them before TPG began "negotiat[ing] the terms of [a] merger [with] Exactech" in late 2017. *Id.* ¶¶ 86, 98. As examples:

- <u>2005</u>: "Exactech introduced the Connexion GXL polyethylene liner for its hip replacement system—the AcuMatch A-Series," *id.* ¶ 77;

- <u>2009</u>: "Exactech introduced the Optetrak Logic," *id.* ¶ 78;

- <u>2016</u>: "Exactech introduced and began marketing the Vantage Total Ankle System," *id.* ¶ 84; and

- <u>Q1 2017</u>: "Exactech introduced . . . the Truliant knee system," *id.* ¶ 85.

Given Plaintiffs' clear focus on **Exactech**'s design, **Exactech**'s packaging, **Exactech**'s devices, and **Exactech**'s purported wrongdoing (*see generally* AC), it is unsurprising that not once—in 142 pages and 790 paragraphs—do Plaintiffs assert that TPG was involved in any way in the design, manufacture, packaging, or sale of a single Exactech device. Indeed, across eleven counts, Plaintiffs do not assert a single direct cause of action against TPG. *Id.* ¶¶ 634-790.

### B. In late 2017, Exactech merged with Osteon Merger Sub, Inc.—not TPG Inc.—in an arm's length transaction.

TPG Inc. is a "global private equity firm" that "primarily ***invest[s]*** in complex asset classes such as private equity, real estate and public market strategies." *Id.* ¶ 101[1]; *see also* Ex. 1 (TPG Inc. 2022 Form 10-K).[2] TPG's holdings and responsibilities go far beyond Exactech. For example, TPG Inc.'s December 2022 10-K notes the following:

---

[1]     All emphases have been added unless otherwise indicated.

[2]     A court may consider publicly disclosed documents filed with the SEC at the motion to dismiss stage. *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019) (considering "in addition to the complaint, and

- **Assets**: "*$135.0 billion* in assets under management . . ."

- **Companies**: "[M]ore than *300 active portfolio companies* . . ."

- **Employees:** "[E]mploy[s] approximately *1,110 people*, including more than *380 investment and operations professionals* . . ."

- **Geographic Scope**: Portfolio companies "headquartered in *more than 30 countries*" and TPG employees "in offices across *8 countries*."

*Id.* at 9.  At best, Plaintiffs' allegations about TPG's relationship with Exactech boil down to typical realities of nearly *any* fund and its portfolio company.  Specifically, Plaintiffs allege that on October 22, 2017, Exactech merged with Osteon Merger Sub, Inc. and became a subsidiary of Osteon Holdings, L.P. (now Osteon Holdings, Inc.).  AC ¶¶ 92-94.  Tellingly, Plaintiffs refer to the publicly available Merger Agreement throughout the Amended Complaint but do not attach it to provide the full picture.  *See, e.g.*, *id.*  The Agreement belies Plaintiffs' efforts to lump the TPG entities—TPG Inc., Osteon Holdings, Inc., Osteon Merger Sub, Inc., and Osteon Intermediate Holdings II, Inc.—together.  In fact, neither TPG Inc. nor any other TPG entity aside from the Osteon entities were party to the merger at all.  *See* Ex. 2 (Oct. 22, 2017 Merger Agreement).[3]  The merger involved a common "stack" structure:



---

written instruments attached, statements incorporated by reference, and public disclosure documents filed with the SEC"); *United States Small Bus. Admin. v. Feinsod*, 347 F. Supp. 3d 147, 153 n.3 (E.D.N.Y. 2018) (taking note of SEC filings in connection with a motion to dismiss).  The Merger Agreement, Proxy Statement, Rollover and Voting Agreement, and TPG's 2022 10-K are all referenced by Plaintiffs throughout the Amended Complaint and/or publicly filed with the SEC.

[3]    Plaintiffs' repeated claim that TPG Capital LP is TPG Inc.'s predecessor (*see, e.g.*, AC ¶¶ 25, 30, 98) is inaccurate; TPG Capital LP does not exist and is not an entity in the TPG corporate structure.

Moreover, the Amended Complaint, Merger Agreement, and Rollover and Voting Agreement (both of which are public and repeatedly cited in the Amended Complaint) confirm that Exactech, Inc. is "the surviving entity" post-merger. AC ¶ 94; Ex. 2 § 1.01 (Exactech "shall continue as the surviving company"); Ex. 3 (Oct. 23, 2017 Rollover and Voting Agreement) (identifying Exactech as "the surviving entity of such Merger"). In other words, there is no dispute whatsoever that Exactech still exists and operates today. *See id.*

In mid-February 2018, the merger closed. AC ¶¶ 30, 102, 103. Exactech received $737 million in the transaction. *Id.* ¶¶ 99, 102.[4]

### C. Exactech operates independently from TPG post-merger.

Not only was Exactech the "surviving" entity post-merger, but also expressly "***continue[d] to exist and conduct business***." Ex. 4 (Jan. 6, 2018 Proxy Statement); *see also, e.g.*, AC ¶ 117 (citing Proxy Statement). According to Plaintiffs, that "business" is the same post-merger as it was pre-merger: "***at all times*** relevant to this action, Exactech designed, tested, studied, researched, formulated, manufactured, inspected, labeled, packaged, stored, promoted, advertised, marketed, distributed, and/or sold Exactech Hip, Knee, and Ankle Devices." AC ¶ 635. Exactech has also continued to be managed day-to-day ***by Exactech*** officers and directors, the majority of which are not connected to TPG. Ex. 2 § 1.06 ("The directors of [Exactech, Inc.] immediately prior to the Effective Time shall be the directors of the Surviving Company until the earlier of their death, resignation or removal . . . ."); *see also* AC ¶ 155 (reflecting two-thirds of Exactech's board members are not connected to TPG).

If anything, Plaintiffs' allegations, as highlighted below, underscore Exactech and TPG's ***separateness*** after the merger, and Exactech's financial and operational independence:

---

[4]    Plaintiffs' allegation that TPG Capital LP contributed the financing (AC ¶ 30) is wrong. *See supra* n.3.

- **<u>Different Purposes</u>**: Plaintiffs allege "Exactech Defendants were in the business of and profited from . . . Exactech Hip, Knee, and Ankle Devices" while "TPG, Inc. is an alternative asset manager that works with *companies in many sectors*, including the medical device sector." *Id.* ¶¶ 22, 27, 28.

- **<u>Different Locations</u>**: Exactech's principal place of business is in Gainesville, Florida (*id.* ¶¶ 18-19) while TPG Inc. operates out of Fort Worth, Texas (*id.* ¶ 24).

- **<u>Different Employees & Boards</u>**: Only three TPG "advisors" are Exactech officers (*id.* ¶ 154-55) and only three are on Exactech's nine-person Board of Directors (*id.*).

- **<u>Fully Funded</u>**: Exactech received $737 million in the merger transaction. *Id.* ¶¶ 102, 103. And the Merger Agreement confirmed Exactech "w[ould] be Solvent" post-merger. Ex. 2 § 3.10. Specifically, the Agreement requires that Exactech's "value" exceed its liabilities, that it "not have . . . an unreasonably small amount of capital for the operation of the businesses," and that it is "able to pay its liabilities." *Id.*

**D.    Recognizing the weakness of their allegations as to TPG, Plaintiffs sought pre-motion discovery, which the Court denied.**

On March 30, 2023, TPG filed a request with the Court to file this motion. ECF No. 176. Plaintiffs responded on April 6, 2023, mostly ignoring their heavy legal burden to state their indirect liability claims against TPG, and instead arguing for pre-motion discovery. ECF No. 183. On May 19, 2023, this Court granted TPG's request to file this motion and on May 30, the Court stayed discovery pending the motion, acknowledging TPG has "substantial arguments for dismissal that are 'potentially dispositive.'" May 30, 2023 Order.

## II.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint must do more than merely incant the elements of the cause of action. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). It is not enough to "couch[]" factual allegations as legal conclusions—a court may "give no effect at all to" such allegations. *Mayor & City Council of Balt, Md. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir.

2013) (quoting *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir. 2007)).

Here, Plaintiffs do not even plead a formulaic recitation of the elements of their indirect theories

against TPG, let alone the substantive allegations required to maintain them.

## III.    PLAINTIFFS FAIL TO STATE A VEIL-PIERCING CLAIM

### A.    Delaware or Florida law—which are consistent for purposes of veil-piercing analysis—apply to the vast majority of cases against TPG.

In an MDL, the court "appl[ies] the choice-of-law rules from the transferor forum."

*Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 112 (2d Cir. 2012).  While TPG undertakes

a state-by-state choice-of-law analysis out of an abundance of caution (*see* App'x A), Plaintiffs

cannot satisfy the veil-piercing standards under ***any*** jurisdiction's laws.  As a result, "the choice-

of-law analysis is unnecessary."  *In re Welding Fume Prod. Liab. Litig.*, 2010 WL 2403355, at

*1, 3, 8 (N.D. Ohio June 11, 2010) (dismissing, without any choice-of-law analysis, "all [veil-

piercing] claims, in every case pending in [an] MDL" with "several hundred cases" because the

plaintiff failed to "allege facts that can support a veil-piercing theory under any state's law").

As Appendix A reflects and other courts have recognized, "in the vast majority of

situations, the law of the state of incorporation governs attempts to disregard the corporate

entity[.]"  *Secon Serv. Sys., Inc. v. St. Joseph Bank & Tr. Co.*, 855 F.2d 406, 413 (7th Cir. 1988)

(holding this principle is "nearly universal").[5]  So too here.  The overwhelming majority of states

from which Plaintiffs' claims against TPG have been transferred apply the law of the state of

incorporation to veil-piercing claims.  To date, cases against TPG have been filed in 18 states.[6]

App'x B.  Of those 18 states, 16 (accounting for ***over 98%*** of the total cases against TPG) look to

---

[5]    *See also, e.g., Tomlinson v. Combined Underwriters Life Ins. Co.*, 2009 WL 2601940, at *3 (N.D. Okla. Aug. 21, 2009) ("[T]he majority of jurisdictions addressing this question have also applied the law of the state of incorporation to veil-piercing issues.") (collecting cases).

[6]    TPG includes both (1) transferring courts and (2) the "Original Districts" in which cases would have been filed but for the Court's order permitting direct filing in the MDL.  ECF No. 74.

the substantive law of the state of incorporation.[7]  App'x A.  Here, the relevant states of incorporation are Florida (Exactech, AC ¶¶ 18-19) and Delaware (existing Osteon entities and TPG Inc., *id*. ¶¶ 24, 32, 35).  Because Delaware and Florida law are "the same" on this issue, cases from both states are relevant—and both require dismissal.[8]

### B. Plaintiffs fail to plead the "extraordinary" allegations required for the "exceptionally rare" right to pierce the corporate veil.

"[C]orporat[e] law is largely built on the idea that the separate legal existence of corporate entities should be respected." *Principal Growth Strategies, LLC v. AGH Parent LLC*, 288 A.3d 1138, 1162 (Del. Ch. 2023).  As a result, in Delaware—along with every other relevant jurisdiction, *see* App'x A (collecting cases)—"[a] subsidiary corporation is presumed to be a ***separate and distinct entity*** from its parent." *Nieves*, 2020 WL 4463425, at *8; *Drewes v. Cetera Fin. Grp., Inc*., 2020 WL 13566405, at *10 (S.D. Fla. July 9, 2020) (dismissing claim and holding it is "well-established that '[a] parent corporation and its wholly-owned subsidiary are separate and distinct legal entities'").

Persuading a court to disregard that presumption and pierce the corporate veil—*i.e.*, to attribute a subsidiary's acts to its parent—is thus a "***very demanding***" and "***difficult*** task," possible only in "the ***most extraordinary*** cases." *PR Acquisitions, LLC v. Midland Funding LLC*, 2018 WL 2041521, at *15 (Del. Ch. Apr. 30, 2018) (citation omitted); *In re Checiek*, 492 B.R. 918, 920 (Bankr. M.D. Fla. 2013); *Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners*

---

[7]    The other two, Georgia and South Carolina, look to the law of the state where the alleged tort occurred (GA) or with the most significant interest (SC).  App'x A.  Uniformly, all states are "***reluctant to disregard the separate existence of related corporations*** by piercing the corporate veil, and have consistently given ***substantial weight to the presumption of separateness***." *EnduraCare Therapy Mgmt., Inc. v. Drake*, 681 S.E.2d 168, 171 (Ga. App. 2009) (citation omitted); Appx' A.

[8]    *See, e.g.*, *Robertson-Ceco Corp. v. Cornelius*, 2007 WL 1020326, at *7 n.7 (N.D. Fla. Mar. 30, 2007) (denying plaintiff's summary judgment motion on veil-piercing and stating that the "Eleventh Circuit has specifically noted that Delaware and Florida law are the same on veil-piercing").

*L.P.*, 491 B.R. 335, 347 (S.D.N.Y. 2013). Indeed, the Supreme Court has dubbed it "the rare exception." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003). Courts across the country routinely view attempts to veil-pierce with "disfavor" and "reluctan[ce]," characterizing the remedy as one appropriate only in "exceptional" instances of "extreme abuse." *See* App'x A.[9]

Plaintiffs' ***own cases*** make this very point. ECF No. 284 at 2 (citing *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1121 (Fla. 1984) (holding that, as "stated in ***all Florida cases*,**" "courts are reluctant to pierce the corporate veil," and quashing lower court opinion allowing veil-piercing absent a "showing of improper conduct")). This already heavy burden is only heavier for Plaintiffs here, who must pierce each layer between the upstream entities in the stack structure—Exactech to Osteon Intermediate Holdings II, Inc.; then to Osteon Holdings, Inc.; and eventually through a series of now unnamed TPG entities, to TPG Inc. *See, e.g.*, *In re HH Liquidation, LLC*, 590 B.R. 211, 273 (Bankr. D. Del. 2018); *Erben v. Raymond James Eur. Holdings, Inc.*, 2012 WL 12874586, at *4 (M.D. Fla. Apr. 10, 2012). Plaintiffs elide this point in their recent letter in opposition to TPG's motion to stay, suggesting the only "veil [that] must be pierced" is Exactech's. ECF No. 284 at 2.

To assert a veil-piercing claim, a plaintiff must allege that (1) the parent has "***exclusive domination and control*** to the point that [the subsidiary] no longer ha[s] legal or independent significance of [its] own" and (2) "the corporate structure ***cause[d] fraud*** or similar injustice."

---

[9]     Even Plaintiffs appear to concede their heavy burden. During the conference on TPG's letter brief previewing its motion to dismiss, and while under the erroneous belief that Delaware law does not apply, Plaintiffs' counsel remarked, "it's a good thing we are not in the Delaware Chancery Court." Ex. 5 (May 19, 2021 Hr'g Tr.) at 11:6-7.

*Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184-85 (Del. Ch. 1999) (citation omitted).[10]

In assessing whether the requisite domination and control has been alleged, courts consider a number of factors. *See Verdantus*, 2022 WL 611274, at *2. Delaware courts boil it down to five: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a façade for the dominant shareholder." *Id.*[11] "Some combination of [the factors is] required" to be pled with "***specific*** supporting factual allegations," and "no single factor" is sufficient. *Id.* at *1, *2 n.14 (quoting *U.S. v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104 (D. Del. 1988)). Plaintiffs' allegations fail at every turn.

1.    **Factors #1, #2 and #4:  No Allegations of Inadequate Capitalization, Insolvency, or "Siphoning" of Exactech Funds.**

Plaintiffs Amended Complaint contains ***zero*** allegations that Exactech was inadequately capitalized following the merger, has solvency concerns, or that TPG "siphoned funds" from Exactech to shield itself from liability. In 790 paragraphs, Plaintiffs never even mention capitalization, solvency, or siphoning. *See* AC. Nor do they allege that Exactech has deficient assets or is unable to meet its financial obligations. *Id.* Comparing Plaintiffs' allegations to those "exceptionally rare" circumstances where veil-piercing was adequately pled is telling.

---

[10]    *See also In re Fundamental Long Term Care, Inc.*, 507 B.R. 359, 374 (Bankr. M.D. Fla. 2014) (stating a plaintiff must establish "(i) domination and control; (ii) improper or fraudulent use of the corporate form; and (iii) injury to the claimant as a result of the fraudulent or improper use of the corporate form.").

[11]    *See also, e.g.*, *Doberstein v. G-P Indus., Inc.*, 2015 WL 6606484, at *4 (Del. Ch. Oct. 30, 2015) (dismissing veil-piercing claim using same factors); *Bentivoglio v. Event Cardio Grp., Inc.*, 2019 WL 6341130, at *5 (S.D.N.Y. Nov. 27, 2019) (applying Delaware law and explaining "[c]ourts consider the[se five] factors when determining whether a parent and subsidiary are a single entity for veil-piercing purposes").

For example, in *Manichaean Cap., LLC v. Exela Techs., Inc*., the plaintiff alleged that the parent entity "was aware of [the holding company's] potential liability . . . and yet made a **deliberate decision** to undercapitalize the entity" by "avoid[ing] flowing funds through [it]." 251 A.3d 694, 708 (Del. Ch. 2021). In short, the plaintiffs alleged the defendants tried to ensure there would be "no way for Plaintiffs to enforce their judgment against [the holding company]" by leaving it with "no direct operating assets," "no bank account, money market account or brokerage account," "no funds, and no prospect of securing funds." *Id*. at 706-07, 709.

Similarly, in *Century*—a case Plaintiffs rely on to establish what must be pled to pierce the corporate veil (ECF No. 284 at 2)—the counter-claimant alleged that the parent siphoned or "diverted . . . stolen commissions [from the plaintiff] to [the subsidiary]" in an effort to "shield [itself] from liability for its wrongful acts." *Magnolia Techs. Corporation's Counterclaim Against Guarantee Tr. Life Ins. Co. and Century Senior Servs.*, 2010 WL 3922681 at ¶ 69 (S.D. Fla. Aug. 19, 2010); *Century Sr. Servs. v. Consumer Health Ben. Ass'n, Inc.*, 770 F. Supp. 2d 1261, 1266 (S.D. Fla. 2011) (denying motion to dismiss given those allegations). Plaintiffs fall far short of the *Century* allegation that the stockholder "us[ed] a corporation for the stockholder's personal interest, and that the stockholder used the corporation for some illegal, fraudulent, or other unjust purpose." *Century*, 770 F. Supp. 2d at 1265.[12]

On the flipside, in *Verdantus*, the court **dismissed** a veil-piercing claim even though plaintiffs alleged the company "never maintained any reserves or operating capital" and "was . . . unable to pay its obligations . . . or even its own attorney's fees." 2022 WL 611274, at *3.

---

[12]    *See, also, e.g.*, *Burtch ex rel. Estate of Opus E., L.L.C. v. Opus, L.L.C. (In re Opus E., L.L.C.)*, 480 B.R. 561, 571 (Bankr. D. Del. 2012) (dismissing a veil-piercing claim over allegations that (1) the parent "required the payment of dividends by the [subsidiary] from the time of its formation that left it consistently undercapitalized;" (2) there were shared legal and accounting services between certain subsidiaries; and (3) the parent's CEO directed the subsidiary's corporate secretary "to keep 'bare-bones' minutes" and excluded the subsidiary's secretary from "executive sessions so there would be no minutes").

Because the plaintiffs did not ***also*** plead that the company "funneled monies up to [its owner] in an effort to avoid payment on a possible future judgment," the court held "the argument that [the company] lacks assets is unavailing." *Id*. Similarly, in *Doberstein*, the plaintiff alleged that the company's owner "had [the company] make direct payments to him in cash on two separate occasions" rather than paying the company itself. 2015 WL 6606484, at *5 n.17. While the court found the "allegation raises[d] questions about [the owner] possibly siphoning off company funds," the plaintiff had failed to plead any other factor, and the allegation was "insufficient, standing alone, to state a claim for piercing the corporate veil." *Id*.

Plaintiffs' allegations here come nowhere close to those in *Manichaean* and *Century* (successfully pled) or *Verdantus* and *Dobertstein* (still dismissed). Instead, the Amended Complaint shows just the opposite. Following the merger, Exactech was fully capitalized. It received ***$737 million*** as "fully committed equity financing for the transaction" with "no financing condition to consummation." AC ¶ 102. The $737 million was also an "increase" in TPG's "equity financing commitment" relative to the initial merger agreement. *Id*. What's more, the Merger Agreement (cited to or referenced nearly 20 times in the Amended Complaint) confirmed Exactech "w[ould] be Solvent" post-merger, meaning its "value" would exceed its liabilities, would "not have . . . an unreasonably small amount of capital for the operation of the businesses in which it is engaged," and would "be able to pay its liabilities." Ex. 2 § 3.10.

Plaintiffs have not pled a single fact supporting Factors 1, 2, or 4. Courts dismiss veil-piercing claims with far more than Plaintiffs plead here; these claims should also be dismissed.

2.   **Factor #3:  No Allegations of a Lack of Corporate Formalities.**

Plaintiffs likewise fail to plead a dearth of "corporate formalities." Examples of corporate formalities include "whether dividends were paid, corporate records kept, [and] officers and

directors functioned properly." *Bentivoglio*, 2019 WL 6341130, at *5 (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1458 (2d Cir. 1995)).

The *Manichaean* and *Century* opinions again provide useful points of comparison. In *Manichaean*, plaintiffs alleged the parent and subsidiary were "**headquartered** at the same address," the subsidiary did not "maintain **proper business registrations**," the parent and subsidiary had "**significantly overlapping personnel**," the parent referred to itself "and its subsidiaries as **one combined enterprise in SEC filings**," and the parent required the subsidiary to "**obtain [its] consent** before" it "pa[id] its own creditors." 251 A.3d 694, 708.

Similarly, in *Century*, the counter-claimant pled the parent and subsidiary "share[d] the **same principal business address**," "employ[ed] the **same attorneys**," and "**share[d] an officer**" such that the subsidiary was "**not managed by directors or managers, but by [the parent] directly**." *Magnolia Techs. Corporation's Counterclaim*, 2010 WL 3922681.

As an initial matter, Plaintiffs say nothing to suggest Exactech is not properly registered or operating as an independent business entity. *See generally* AC. As for the other facts pled in *Manichaean* and *Century*—headquarters, personnel, and individual vs. combined enterprises—Plaintiffs' own allegations prove they cannot meet this factor.

**Different Headquarters.** Plaintiffs allege Exactech and TPG have different principal places of business: Exactech in Gainesville, Florida (AC ¶¶ 18-19) and TPG Inc. in Fort Worth, Texas (*id.* ¶ 24).[13] That makes sense—as noted above, Exactech is just *one* of the more than 300 active portfolio companies in which TPG is invested. Ex. 1 at 8.

---

[13]    Plaintiffs allege Osteon Holdings, Inc. and Osteon Intermediate Holdings II, Inc. have their principal places of business in Delaware. AC ¶¶ 32, 35.

**Minimal Overlapping Personnel.**  Plaintiffs allege that three officer positions and three board positions at Exactech have been filled by "TPG advisors" since the merger.  AC ¶¶ 152-154.  But even having "*identical* personnel" between the parent and subsidiary "does not by itself warrant ignoring the corporate form."  *Nieves*, 2020 WL 4463425, at *8 (granting motion to dismiss in part).  Of the approximately **1,110 people** TPG employs, Plaintiffs allege that just **six** have served as an officer or director at Exactech.  Ex. 1 at 8; AC ¶ 154.  The overlap is far from 100%, which would not even be enough to pierce the corporate veil.  *Nieves*, 2020 WL 4463425, at *8; *see also Garcia v. Gravity Interactive, Inc.*, 2012 WL 13005342, at *5 (S.D. Fla. Jan. 17, 2012) ("[O]ne-hundred percent ownership and identity of directors are, even together, an insufficient basis for applying an alter ego theory to pierce the corporate veil.") (internal citation omitted); *Trustees, Vill. of Arden v. Unity Constr.*, 2000 WL 130627, at *3 (Del. Ch. Jan. 26, 2000) (noting "common management of two entities does not, by itself, justify" veil-piercing).

**No "Combined Enterprise."**  Unlike in *Manichaean* where the parent referred to itself and its subsidiaries as "one combined enterprise" in public filings, TPG Inc. does much the opposite, referring to its 300-plus "portfolio companies" separately.  *See* Ex. 1 at 8.

Plaintiffs also try to pierce the corporate veils between the Osteon entities and TPG Inc.  Specifically, Plaintiffs allege that (i) "TPG and its affiliates operate . . . under the global brand name, 'TPG,'" and (ii) TPG Inc. "controlled Osteon Holdings, LP (now Osteon Holdings, Inc.) and the negotiations related to the Exactech merger through its common officers, general counsel, and outside counsel."  AC ¶ 125.  For starters, this attempt does not connect *Exactech* to TPG Inc.  Nor does it come close to piercing the veil between the Osteon entities and TPG Inc.  Operating under a "global brand name" of TPG (AC ¶ 125) is not sufficient to pierce the veil: such practices are "ubiquitous and courts regularly hold that a plaintiff must show more than a corporate family

member's use of a shared logo or trademark to substantiate a claim for veil piercing." *Prewett Enters., Inc. v. Grand Trunk W. R.R. Co.*, 2019 WL 6310495, at *4 (N.D. Ill. Nov. 25, 2019). And, as noted above, having "common officers, general counsel, and outside counsel" (AC ¶ 125) is not sufficient either. *Nieves*, 2020 WL 4463425, at *8; *Garcia*, 2012 WL 13005342, at *5. As the many SEC filings Plaintiffs cite in their Amended Complaint prove, corporate formalities were observed at each turn, and this factor cannot be met.

### 3. Factor #5: No Allegations That Exactech "Simply Functioned as a Façade" For TPG.

Finally, Plaintiffs do not allege that that Exactech is a "façade" for TPG. Nor could they. These companies have dramatically different purposes, operating in entirely different spaces. AC ¶¶ 22, 28. As TPG's public filings make clear, it has a "diversified, innovative array of multi-product investment platforms," overseeing over $135 billion in assets under management and more than 300 active portfolio companies—of which Exactech is only one. AC ¶ 101; *see also* Ex. 1 at 8. The $737 million invested in Exactech translates to only *0.55%* of TPG's assets under management. *See id.* Plaintiffs include no allegations explaining why Exactech is somehow differently treated by TPG than its other hundreds of portfolio companies. Plaintiffs' strained attempts to allege this factor fall far short.

**Typical "Affiliate" Relationships.** Plaintiffs allege that: (i) the Osteon entities are "referred to as 'Affiliates' of [TPG] in SEC filings related to the merger"; (ii) those Osteon entities "were the corporate vehicles used" by TPG "to consummate the merger with Exactech, Inc."; and (iii) "[t]he Securities Act of 1933 defines an Affiliate as an entity that 'directly, or indirectly through one or more intermediaries, **controls or is controlled by**, or is under common control with, the person [entity] specified.'" AC ¶¶ 100, 104-105 (emphasis in original). Plaintiffs allege

that, as a result, Exactech is an "affiliate controlled by TPG" and TPG is "accordingly [] liable for" Exactech's alleged acts. *Id.* ¶ 107.

This focus on the word "affiliate" to attempt to pierce the corporate veil has been rejected: "[I]f simply meeting [the] definition of 'affiliate' [contained in the Securities Exchange Act] was sufficient to establish an alter-ego theory, veil-piercing would apply as a matter of course, because all 'affiliates' would meet that definition." *Lopez v. Stanley Black & Decker, Inc.*, 764 F. App'x 703, 712 n.5 (10th Cir. 2019) (quotations omitted). Plaintiffs' "reasoning confuses a definitional term designed to loosely clarify the organizational relationships of [parents and subsidiaries] with a legal test requiring specific factual showings." *Lopez v. Delta Int'l Mach. Corp.*, 2017 WL 3142028, at *42 (D.N.M. July 24, 2017) (quoting *Akerblom v. Ezra Holdings Ltd.*, 848 F. Supp. 2d 673, 689 (S.D. Tex. 2012)) (holding even if an "affiliate" designation "denot[es] some measure of 'control,' that does not establish that [parent] 'exerts such domination and control' over [subsidiary's] that 'they do not in reality constitute separate and distinct corporate entities'").

The law clearly directs otherwise—mere "affiliate" relationships cannot pierce the corporate veil. *See, e.g.*, *Variable Annuity Life Ins. Co. (VALIC) v. Dull*, 2009 WL 3064750, at *4 (S.D. Fla. Sept. 22, 2009) (finding a "lone allegation of mere affiliation . . . does not suggest, let alone prove, that a [parent] controls [a subsidiary] or that they are essentially one entity"); App'x A (collecting cases noting veil piercing is "very demanding" and "exceptionally rare"). Put simply, Plaintiffs' "unadorned invocation of dominion and control" in its allegations of Exactech's "affiliate" status to TPG "is simply not enough to state a claim premised on veil piercing." *Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 347 (S.D.N.Y. 2013) (internal citation and quotations omitted) (applying Delaware and other states' veil-piercing principles).

**No Assumption of Liabilities.**  Plaintiffs summarily allege that "[t]he language of the Merger Agreement and SEC filings demonstrates that 'the TPG parties' and Exactech co-mingle liabilities" and "share economic resources."  AC ¶ 136.  Nowhere do Plaintiffs allege any specifics, or that the Osteon entities or TPG actually assumed Exactech's liabilities.  Instead, Plaintiffs resort to an unspecific claim that Osteon Holdings, Inc. assumed "certain" liabilities of Exactech.  AC ¶¶ 130-132.  This conclusory allegation is not enough.  *See, e.g., Harvest Food Grp., Inc. v. Newport Int'l of Tierra Verde, Inc.*, 2008 WL 4927006, at *3 n.1 (S.D. Fla. Nov. 17, 2008) (holding plaintiffs failed to allege that parent assumed subsidiary's liabilities since pleading that parent "is responsible for [subsidiary's] assets and liabilities" is "merely" a "legal conclusion"); *see also First Bank of Delaware v. LeanSpa LLC*, 2012 WL 924877, at *2 (D. Del. Mar. 19, 2012) (dismissing alter ego liability claim where the allegations "to support the alter ego liability are nothing more than labels and conclusions").

The underlying documents Plaintiffs cite prove why courts reject such vague assertions. In reality, Osteon Holdings, Inc. merely reserved the right to "participate in the ***defense***" of "any ***security holder*** litigation . . . related ***to the merger***."  AC ¶ 131; *see also* Ex. 2 § 6.05 (noting the same).  Participating in defending a claim against a subsidiary is not the same as assuming its liabilities.  What is more, the reservation of rights to participate in Exactech's defense related only to shareholder litigation—not the litigation at issue here.  *See id.*

These allegations do not reflect the "co-mingling of liabilities" or "share[d] economic resources" between TPG and Exactech.  *See, e.g.*, *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 559 (Bankr. D. Del. 2012) (finding sufficient veil-piercing allegations where parent "used its own cash to manipulate [subsidiary's] audit, infusing [subsidiary] with cash to avoid a going-concern qualification, and then transferring the cash back to [parent]"); *Merkin v. PCA Health Plans of*

17

*Fla., Inc.*, 855 So. 2d 137, 141 (Fla. Dist. Ct. App. 2003) (finding alter-ego jurisdiction allegations sufficient where counter-defendant was allegedly "commingling and pooling its substantial funds with his personal funds . . . running the various companies as a single enterprise, and utilizing [one entity] for improper purposes including theft of [counter-plaintiff's] money").

**Conclusory Allegations of "Control" Over Decision-Making.**  Plaintiffs' allegations that TPG "controls" Exactech fare no better.  ***First***, Plaintiffs allege that "[p]er the 2017 Amendment to the Rollover and Voting Agreement," Exactech "operate[s] using TPG's 'customary management agreement.'"  AC ¶ 126.  Plaintiffs further allege that the "management agreement did not require unanimous consent from the Exactech board," thereby giving the (only three) TPG members on Exactech's (nine-member) board purportedly more power.  *See id.*  This is an overread of the Rollover and Voting Agreement at best,[14] and irrelevant at worst.

As Plaintiffs' allegations make plain, only "[o]ne-third of the nine-member Exactech Board of Directors is composed of TPG employees."  AC ¶ 155.  In other words, the ***majority*** of Exactech's Board is ***not*** tied to TPG.  *See id.*  And even if TPG does exert some influence on Exactech via the management agreement or board presence, that in no way justifies piercing the corporate veil.  "The degree of control required to pierce the veil is '***exclusive domination and control*** . . . to the point that [the General Partner] ***no longer ha[s] legal or independent significance of [its] own***.'"  *Wallace*, 752 A.2d at 1183-84.  Plaintiffs' conclusory allegations of control come nowhere near the high bar required to show Exactech is merely a façade for TPG.  Even with far more specific factual allegations of control than what Plaintiffs plead here, courts consistently dismiss veil-piercing theories:

---

[14]    For example, the Rollover and Voting Agreement provides for "***a*** customary management agreement"—not a specific ***TPG*** management agreement.  Ex. 3.

- In *Pinnacle Foods of Cal., LLC v. Popeyes La. Kitchen, Inc.; Rest. Brands Int'l, Inc.*, the court dismissed plaintiff's jurisdictional theory, even though the plaintiff had alleged that the parent and subsidiary had "regular and extensive contact," a "very close working relationship," and "overlapping officers." 2022 WL 17736190, at *17 (S.D. Fla. Dec. 16, 2022). The plaintiff also alleged that the subsidiary "had no 'independent marking [sic] plan or strategic plan,'" *id.* (citation omitted), an allegation Plaintiffs do not make here. The court found that these allegations were insufficient to show the subsidiary "was a 'mere instrumentality' that lack[ed] 'separate corporate interests of its own' and function[ed] 'solely to achieve the purpose of the dominant corporation.'" *Id.* (quoting *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1273 (11th Cir. 2002)).

- In *In re Chocolate Confectionary Antitrust Litig.*, the court dismissed an alter ego theory for jurisdictional purposes over allegations that the parent could "ordain" the subsidiary's officers and directors, "influence executive compensation, approve budgets, gather information about corporate performance, and receive distributions of subsidiary profits." 674 F. Supp. 2d 580, 599 (M.D. Pa. 2009). The court concluded such facts "typify standard parent-subsidiary interactions and do not reflect daily, operational control that is the *sine qua non* of an alter ego relationship." *Id.*

In short, Plaintiffs' allegations of control through the management agreement or board membership come nowhere near those in *Pinnacle*, *In re Chocolate Confectionary*, or a number of other cases which were dismissed as this case should be.[15]

**Second**, Plaintiffs claim "TPG advisors and Officers directed the Exactech Hip, Knee, and Ankle Device recalls" because they were "involve[d] in Exactech presentations after the merger" "regarding … recall[s]." AC ¶¶ 157-168. Conclusory allegations that TPG was "involved" with Exactech recalls say nothing about TPG's actual control over Exactech. *See, e.g.*, *Classic Soft Trim, Inc. v. Albert*, 2020 WL 6734402, at *4-5 (M.D. Fla. Aug. 13, 2020) (dismissing parent-company defendants under alter ego jurisdiction theory: "[a] parent corporation can be ***directly involved*** in the activities of its subsidiaries without incurring liability if the involvement is 'consistent with the parent's investor status.'") (quoting *United States v. Bestfoods*, 524 U.S. 51,

---

[15]     *See, e.g.*, *Riad v. Porsche Cars N. Am., Inc.*, 2023 WL 2227692, at *5 (E.D. Pa. Feb. 24, 2023) (dismissing alter ego theory even though the plaintiff "identifie[d] several provisions in the Importer Agreement" providing that the defendant "exercises some level of control over the corporate structure of [the other entity]" and "dictates the duties and responsibilities of [the other entity's]" officers because such "facts merely suggest a typical parent-subsidiary relationship, or an arm's length contractual relationship").

69 (1998)); *Miami Prods. & Chem. Co. v. Olin Corp.*, 449 F. Supp. 3d 136, 174 (W.D.N.Y. 2020) (dismissing veil-piercing claim over "generalized and conclusory" allegations that acts were "authorized, ordered, or performed by Defendants' . . . representatives, which actively engaged in the management, direction, or control of Defendants' businesses").

*Third*, and finally, Plaintiffs plead TPG "knew or should have known of the clinical evidence of early onset failures" "during due diligence." AC ¶ 159. But alleging knowledge from due diligence "seemingly acknowledge[s] that [defendant did not] control[] [the alter ego's] actions throughout." *Ronnoco Coffee, LLC v. Westfeldt Brothers, Inc.*, 2017 WL 635491, at *5 (E.D. Mo. Feb. 16, 2017), *aff'd*, 939 F.3d 914 (8th Cir. 2019) (dismissing claim where plaintiff alleged defendant "only became aware of the [conduct] while conducting due diligence").[16]

In sum, allegations that three TPG advisors sit on Exactech's board, three others served as officers, TPG was involved with recalls, and that TPG learned of issues during due diligence are a far cry from showing TPG **dominated and controlled** Exactech. *Compare* ¶ 158 ("TPG was *directly involved* in decision making related to the recalls.") *with, e.g., Classic Soft Trim*, 2020 WL 6734402, at *4-5 (noting it is "entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary" and the parent "can be *directly involved*" without piercing the corporate veil) (citation omitted); *Ross Prods. Div. Abbott Lab'ys Inc. v. Saper*, 2007 WL 1288125, at *6 (E.D.N.Y. Apr. 26, 2007) (dismissing veil piercing claim over "conclusory" allegation that "[defendant] is *directly involved* in the operation and management of [another entity] to such an extent that [its] separate status as a corporate entity is completely ignored").[17]

---

[16]    Plaintiffs' allegation that Exactech's then-CEO Darrin Johnson "*conferred* with TPG" in deciding whether to terminate Exactech's then-CFO does not move the needle either.  AC ¶¶ 165-166; *see, e.g., In re Chocolate Confectionary*, 674 F. Supp. 2d at 599 (denying veil-piercing theory where parent could "*ordain*" subsidiary's "officers and directors").

[17]    Plaintiffs' cherry-picking random phrases on TPG's website does not solve their problem either.  *See* AC ¶¶ 137-144.  Plaintiffs allege "TPG promotes its 'distinctive,' 'alternative,' and 'unique' approach to growing the

4.    **No Allegations of Corporate Form's Use for Injustice or Unfairness.**

In addition to the five factors above, a plaintiff "must always" plead "injustice or unfairness." *Verdantus*, 2022 WL 611274, at *2 n.14 (quoting *Golden Acres, Inc.*, 702 F. Supp. at 1104). Plaintiffs have not even tried to allege that Exactech "was formed or used by its corporate parents to achieve an 'improper purpose,'" or "exist[s] for no other purpose than as a vehicle for fraud." *Id.*; *Aldana v. Fresh Del Monte Produce, Inc.*, 2007 WL 7143959, at *6 (S.D. Fla. Aug. 30, 2007) (quoting *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So.2d 1114, 1120-21 (Fla. 1984)).[18] Nor could they.

Exactech operates today as it did pre-merger. *See supra* Section I.C. Only Exactech's ownership changed: before, public shareholders; after, TPG. *See* Ex. 4 (Exactech "will become a wholly owned subsidiary of Parent and will no longer be a publicly traded corporation"). Given "the complete absence of any basis to infer" that TPG used "the subsidiary entities . . . to perpetrate a fraud," Plaintiffs' veil-piercing claim must be dismissed for this reason alone. *In re Digit. Music Antitrust Litig.*, 812 F. Supp. 2d 390, 418-19 (S.D.N.Y 2011) (Delaware law).

## IV.    PLAINTIFFS FAIL TO STATE A SUCCESSOR LIABILITY CLAIM

### A.    Relevant successor liability principles are largely universal.

"Successor liability law is **largely consistent** across the states and federal courts." *See Asarco, LLC v. Union Pac. R.R. Co.*, 2017 WL 639628, at *17 (D. Idaho Feb. 16, 2017) (citing *Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 363 (9th Cir. 1997)); 15 Fletcher Cyc. Corp. § 7121 (describing successor liability principles true "in all jurisdictions

___

companies that it invests in." *Id.* ¶ 139. Nothing ties those generic strategies to TPG's investment in **Exactech**. Nor would it—TPG's website reflects its high-level approach for its more than 300 portfolio companies.

[18]    Plaintiffs' "underlying cause of action" against Exactech cannot qualify as the required "injustice." *See, e.g.*, *Bentivoglio*, 2019 WL 6341130, at *6 ("An underlying cause of action . . . cannot 'supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless . . . .'") (citation omitted).

today"). In light of this uniformity, another MDL court easily dismissed "*all*" successor liability claims pending against a parent-company defendant, finding the choice-of-law analysis "unnecessary." *In re Welding*, 2010 WL 2403355, at *3 (rejecting argument that defendant's dispositive motion "should be denied because [it] did not include a choice-of-law analysis"); *see also Howard v. Clifton Hydraulic Press Co.*, 830 F. Supp. 708, 712 (E.D.N.Y. 1993) ("[T]his Court need not determine which state's law applies" where the "issue of successor liability does not turn out differently" under different states' laws.); *In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proc.*, 2017 WL 4772759, at *13 (N.D. Ill. Oct. 23, 2017) ("forego[ing] a choice-of-law analysis" on successor liability in an MDL).

Should the Court engage in a choice-of-law analysis, the majority of cases against TPG require the application of Delaware or Florida law to Plaintiffs' successor liability theories as well. *See* App'x A.[19] And regardless, the same "well-settled general rule[s]" for successor liability have been "adopted in virtually every [s]tate." *Ronnoco*, 939 F.3d at 920. Specifically, "***if the original entity still exists, there is no successor—and no successor liability***." *In re Welding*, 2010 WL 2403355, at *7 (collecting cases); *see also* App'x A. Here, because Exactech still exists and is responsible for any future liabilities, there can be no successor liability levied against the TPG Defendants.

---

[19]    ***Forty-seven percent*** of all cases pending against TPG were transferred from California, Florida, New York, or Louisiana (or filed directly in the MDL by Plaintiffs with "Original Districts" there). App'x B. These states apply the law of the state of incorporation—here, Delaware or Florida—to successor liability claims. App'x A. Another ***12%*** of all cases were transferred from Tennessee, Texas, or Virginia, which require the Court to assess the agreement Plaintiffs claim underlies their theory—here, the Merger Agreement—and apply the relevant state's law. App'x A; App'x B. Again, Delaware or Florida law applies: the Merger Agreement contemplates a merger under ***Florida*** law between entities incorporated in ***Florida*** and ***Delaware*** and contains a governing law provision selecting ***Florida*** law. Ex. 2 §§ 1.01, 9.08; App'x A.

**B.      Plaintiffs have not pled that *any* TPG Defendant is a successor.**

The successor liability doctrine applies when a corporation "***ceases to exist*** and another continues."  15 Fletcher Cyc. Corp. § 7121.  When that occurs, "the latter corporation is liable for the debts, contracts and torts of the former" that no longer exists.  *Id*.  For example, in *Omar v. 1 Front St. Grimaldi, Inc.*—a case cited by Plaintiffs (ECF No. 183 at 2)—pizza business Grimaldi Pizza was sued for failing to pay minimum wages.  2018 WL 2121550, at *4 (E.D.N.Y. May 8, 2018).  Grimaldi "became inactive" and "dissolved," and Dumbo Restaurant Corp. replaced it in operating the pizza shop; the question was whether Dumbo was the "successor" liable for the alleged failures of Grimaldi.  *Id.* at *1-2; *see also* App'x A (collecting similar cases).

On the other hand, "*[t]here can be no successor liability in these MDL cases*" where "*[the alleged tortfeasors] still exist* and continue to operate separately as subsidiaries of [the purported successor]."  *In re Welding*, 2010 WL 2403355, at *7; *Norfolk S. Ry. Co. v. Pittsburgh & W. Va R.R.*, 153 F. Supp. 3d 778, 807 (W.D. Pa. 2015), *aff'd*, 870 F.3d 244 (3d Cir. 2017) ("If the original entity still exists . . . there is no successor, and therefore, no successor liability."); *see also Ray v. Jud. Corr. Servs., Inc.*, 2018 WL 2130408, at *5 (N.D. Ala. May 9, 2018) (refusing to apply successor liability when the predecessor "continued to operate as a separate subsidiary").

Here, the successor liability doctrine is wholly inapplicable.  Exactech is still active, doing business, and liable for any wrongdoings Plaintiffs allege in this lawsuit—Plaintiffs "can pursue [their] claims against" Exactech.  *In re Welding*, 2010 WL 2403355, at *7.  The Amended Complaint, and SEC filings referenced therein, are crystal clear on this point:

- **Exactech Is The Surviving Entity:** "*Exactech, Inc. will be the surviving entity*."  AC ¶ 94; *id.* ¶ 44 ("Osteon Merger Sub, Inc. … merged ***into*** Exactech"); Ex. 2 § 1.01 (Osteon Merger Sub., Inc. "shall cease" while Exactech is the "Surviving Company"); Ex. 4 (Exactech "will be the Surviving Corporation in the merger").  As the sole "Surviving Company," Exactech also maintained obligations arising from running its business.  AC ¶ 94; Ex. 2 § 3.10 (warranting that "Surviving Company . . . will be Solvent" "[f]ollowing the [m]erger").

23

- **Exactech Continues To Do Business:** Exactech has operated the same business of designing, manufacturing, and selling "***Exactech*** Hip, Knee, and Ankle Devices" "at all times relevant to" this litigation, including after the merger. AC ¶¶ 635, 653, 673, 696, 709, 720, 729, 745, 762; Ex. 4 (Exactech "***will continue to exist and conduct business*** following the merger").

- **Exactech Is Responsible For Its Liabilities:** The Merger Agreement requires that Exactech "will be able to pay its liabilities, including contingent and other liabilities," meaning Exactech "will be able to generate enough cash from operations, asset dispositions or lines of credit, or a combination thereof, to meet its obligations as they become due." Ex. 2 § 3.10.

In sum, there is no basis for "successor" liability because there is no successor. This is true not only as a matter of fact (as pled), but also as ingrained in the corporate structure. Indeed, the merger structure at issue here is sometimes referred to as a "reverse triangular merger." *In re Welding*, 2010 WL 2403355, at *7. As "courts have recognized," the "***reverse triangular merger . . . does not result in the parent company*** [*i.e.*, Osteon Intermediate Holdings II, Inc.] ***assuming the liabilities*** of the acquired company [*i.e.*, Exactech]." *Id.*; *see also Ray*, 2018 WL 2130408, at *4-5 ("[A] reverse triangular merger … is '***specifically designed to preclude the imposition of successor liability***.'") (citation omitted); 14A Fletcher Cyc. Corp. § 7011 (noting a triangular merger "avoid[s] direct exposure to the liabilities of the target corporation"); *Norfolk*, 153 F. Supp. 3d at 808 (finding the reverse triangular merger "did not create successor liability on the part of [the parent]" and collecting several cases).

Nor can Plaintiffs argue that TPG is somehow a "mere continuation" of Exactech, or that Exactech and TPG entered into a "de facto merger," such that Exactech and TPG are now one-in-the-same. For example, to show "a successor corporation is liable as a mere continuation of the prior corporation, a plaintiff must present substantial evidence" that the seller "ceased ordinary business" and the purchaser "assumed . . . liabilities and obligations of the seller." *Ray*, 2018 WL 2130408, at *5. Similarly, there is no de facto merger where the seller "continued to conduct ordinary business functions under its own name," "remains a separately operating entity separate and distinct from" the purchaser, "and never ceased its own ordinary business operations." *Id.*

Exactech fits that bill: it still operates "under its own name" and "never ceased its own ordinary operations." *See, e.g.*, AC ¶ 635 (alleging Exactech has been in business "at all times"). And as the Merger Agreements sets out, Exactech remains on the hook for any liabilities. *See, e.g.*, Ex. 2 § 3.10.[20] Nor is there is any allegation that TPG holds itself out as a continuation of Exactech—rather, Exactech is one of 300-plus companies in TPG's asset management portfolio.

This all makes good sense. The "purpose of successor liability is to ensure that claimants are not left without recourse" because the alleged tortfeasor no longer exists. *In re Welding*, 2010 WL 2403355, at *7; *see also* Restatement (Third) of Torts: Prod. Liab. § 12, Comment (b) (1998) (similar). That is decidedly not the case here. Exactech is both the predecessor and the successor, and Plaintiffs can still pursue remedies against it—***they are doing so in this very litigation***. Plaintiffs' successor liability theory against TPG Defendants must be dismissed accordingly.

## V.    CONCLUSION

Plaintiffs' claims against TPG attempt to force a round peg into a square hole: this is not a case where piercing the corporate veil or alleging "successor" liability makes sense. Nowhere do Plaintiffs allege that Exactech and TPG are co-mingling funds, Exactech is running from its liabilities through a complicated corporate structure, or Exactech is out of business, replaced by TPG in its stead. The reality is far more simple. As Plaintiffs' Amended Complaint confirms: TPG is an asset manager and Exactech is its portfolio company. There is nothing more. On these facts as pled, TPG's motion to dismiss should be granted with prejudice.

---

[20]    As discussed above (*supra* at 17), Plaintiffs alleged that Exactech and Osteon Holding will "jointly participate in the defense or settlement of any security holder litigation" (AC ¶ 131), but this in no way means that Exactech is not liable for any alleged wrongdoing.

Dated: June 9, 2023

Respectfully submitted,

By:    */s/ Jay P. Lefkowitz*
           Jay P. Lefkowitz
           Mark Premo-Hopkins (*pro hac vice*)
           Christa Cottrell (*pro hac vice*)
           Cameron Ginder (*pro hac vice*)
           **KIRKLAND AND ELLIS LLP**
           300 North LaSalle Street
           Chicago, Illinois 60654
           +1 (312) 862-2000
           +1 (312) 862-2200
           jay.lefkowitz@kirkland.com
           mark.premohopkins@kirkland.com
           ccottrell@kirkland.com
           cameron.ginder@kirkland.com

           *Counsel for TPG Defendants*

## PROOF OF SERVICE

I hereby certify that on June 9, 2023, I caused a copy of Defendants TPG Inc., Osteon Holdings, Inc., Osteon Merger Sub, Inc., and Osteon Intermediate Holdings II, Inc.'s Memorandum in Support of Motion to Dismiss to be served via electronic mail on the individuals designated as Plaintiffs' Co-Lead Counsel and Liaison Counsel (ECF Nos. 46, 269).

Dated: June 9, 2023

/s/ Jay P. Lefkowitz

Jay P. Lefkowitz