**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**(BROOKLYN)**

| | |
|---|---|
| IN RE: EXACTECH POLYETHYLENE ORTHOPEDIC PRODUCTS LIABILITY LITIGATION | MDL No. 3044 (NGG) (MMH) |
| | Case No.: 1:22-md-03044-NGG-MMH |
| | **District Judge Nicholas G. Garaufis** |
| | **Magistrate Judge Marcia M. Henry** |
| _____ / | |
| **THIS DOCUMENT RELATES TO:** **ALL CASES AGAINST TPG DEFENDANTS** | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS TPG INC.; OSTEON HOLDINGS, INC.; OSTEON MERGER SUB, INC. AND OSTEON INTERMEDIATE HOLDINGS II, INC.'S MOTION TO DISMISS**

**Served: July 14, 2023**

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION** ............................................................................................................... 1

**WELL PLED FACTS AND INFERENCES THAT CAN BE DRAWN THEREFROM THAT MUST BE ACCEPTED AS TRUE** ........................................................................ 2

**LEGAL STANDARD** ....................................................................................................... 6

**ARGUMENT** ...................................................................................................................... 7

   I.    DEFENDANTS' MOTION IS PREMATURE AND SHOULD BE DENIED. ............... 7

   II.   PLAINTIFFS' VEIL PIERCING CLAIMS ARE WELL PLED. ................................ 10

      A.   Choice of Law ................................................................................................ 10

          1.   For States With Choice of Law Analyses that Default to the State of Incorporation, Florida Law Applies. ........................................................ 11

          2.   Of the States TPG Identifies, At Least Three Do Not Default to the State of Incorporation. ................................................................................ 12

      B.   Plaintiffs' Veil Piercing Claims Are Well Pled Under Each State's Law. ............ 13

          1.   The Master Complaint Adequately Pleads Domination and Control. .................... 17

          2.   The Master Complaint Adequately Pleads that the TPG Defendants' Improper or Fraudulent Use of Exactech Harmed Plaintiffs. .................................... 21

      C.   Once Exactech's Veil is Pierced, Each TPG Defendant May be Held Liable............ 22

   III.   DEFENDANTS' MOTION FAILS TO ADDRESS THE THEORY OF SUCCESSOR LIABILITY PURSUED BY PLAINTIFFS. ...................................................................... 24

**CONCLUSION** ................................................................................................................. **25**

i

## TABLE OF AUTHORITIES

**Cases**

*Aldana v. Fresh Del Monte Produce Co.,*
    2007 WL 7143959 (S.D. Fla. Aug. 30, 2007)................................................................. 14

*Alford v. City of New York,*
    413 F.Supp.3d 99 (E.D.N.Y. 2018) ................................................................................. 24

*Anschutz Corp. v. Merrill Lynch & Co.,*
    690 F.3d 98 (2d Cir. 2012).................................................................................... 1, 7, 11

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).......................................................................................................... 6

*Auld v. Forbes,*
    309 Ga. 893 (2020) ......................................................................................................... 12

*Aztec Motel, Inc. v. State ex rel. Faircloth,*
    251 So. 2d 849 (Fla. 1971)............................................................................................. 14

*Baillie Lumber Co. v. Thompson,*
    612 S.E.2d 296 (Ga. 2005)............................................................................................. 16

*Bellairs v. Mohrmann,*
    716 So. 2d 320 (Fla. 2d DCA 1998) .............................................................................. 14

*Bristol-Myers Squibb Co. v. Matrix Labs. Ltd.,*
    655 Fed. Appx. 9 (2d Cir. 2016)........................................................................ 1, 8, 10, 13

*Century Sen. Servs. v. Consumer Health Ben. Ass'n,*
    770 F.Supp.2d 1261 (S.D. Fla. 2011) ............................................................................ 14

*Church Joint Venture v. Blasingame,*
    2016 WL 3248044 (W.D. Tenn. Jan. 13, 2016) ............................................................ 12

*Church Joint Venture v. Blasingame,*
    947 F.3d 925 (6th Cir. 2020) ......................................................................................... 12

*Classic Soft Trim v. Albert,*
    2020 WL 6734402 (M.D. Fla. Aug. 13, 2020) .............................................................. 19

*Colgate-Palmolive Co. v. Lanfranchi North Am., Inc.,*
    2020 WL 5440554 (S.D.N.Y. Sept. 8, 2020).................................................................. 13

*Cont'l Bankers Life Ins. Co. of the S. v. Bank of Alamo*,
    578 S.W.2d 625 (Tenn. 1979) ........................................................................ 14, 15

*Dania Jai-Alai Palace v. Sykes*,
    450 So.2d 1114 (Fla. 1984) ................................................................................. 14

*Dawkins v. State*,
    412 S.E. 2d 407 (S.C. 1991) ............................................................................... 12

*Est. of Jackson v. Schron*,
    2016 WL 4718145 (M.D. Fla. Sept. 8, 2016) ..................................................... 13

*Fed. Dep. Ins. Corp. v. Allen*,
    584 F. Supp. 386 (E.D. Tenn. 1984) .................................................................. 15

*Ferrer v. Citigroup Global Mkts., Inc.*,
    2011 WL 1322296 (E.D.N.Y. Mar. 31, 2011) ...................................................... 6

*Garcia v. Coffman*,
    946 P.2d 216 (N.M. Ct. App. 1997) ................................................................... 21

*Gen. Holding, Inc. v. Cathcart*,
    2009 WL 9119981 (D.S.C. July 29, 2009) ......................................................... 15

*Hagan v. Armstrong Int'l*,
    2020 S.C.C.P. LEXIS 649 (June 29, 2020) ........................................................ 23

*Hunting v. Elders*,
    597 S.E.2d 803 (S.C. Ct. App. 2005) .................................................................. 16

*In re Hillsborough Holdings Corp.*,
    166 B.R. 461 (Bankr. M.D. Fla. 1994) ............................................................... 13

*In re Maxus Energy Corp.*,
    641 B.R. 467 (Bankr. D. Del. 2022) ................................................................... 23

*In re Paraquat Prods. Liab. Litig.*,
    2023 WL 3948249 (S.D. Ill. June 12, 2023) ............................................ 2, 10, 13

*In re Samsung DLP TV Class Action Litig.*,
    2009 WL 3584352 (D.N.J. Oct. 27, 2009) ........................................................... 8

*In re Trasylol Prods. Liab. Litig.*,
    2009 WL 577726 (S.D. Fla. March 5, 2009) ........................................................ 7

*In re Welding Fume Prod. Liab. Litig.,*
  2010 WL 2403355 (N.D. Ohio June 11, 2010).......................................................... 11

*In Re: Allergan Biocell Textured Breast Implant Prods Liab. Litig.,*
  537 F.Supp.3d 679 (D.N.J. 2021) ............................................................................ 7

*J & J Sports Prods. v. La Parranda Mexicana Bar & Restaurante Co.,*
  2018 WL 4378166 (E.D.N.Y. Apr. 9, 2018) ............................................................ 3

*Kleweis v. Transport Support,*
  972 F. Supp. 494 (E.D. Mo. 1997)........................................................................... 21

*Mid-South Mgmt. Co. v. Sherwood Dev. Corp.,*
  374 S.C. 588 (S.C. Ct. App. 2007) .......................................................................... 16

*Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC,*
  975 F.Supp.2d 392 (S.D.N.Y. 2013)........................................................................ 11

*One Step Up., Ltd. v. Wahoo Creek Trading Co.,*
  2020 WL 13596325 (N.D. Ga. July 6, 2020)...................................................... 16, 23

*Oskin v. Johnson,*
  400 S.C. 390 (S.C. 2012) ......................................................................................... 16

*Paul v. Destito,*
  250 Ga. App. 631 (Ga. Ct. App. 2001) .................................................................... 16

*Pertuis v. Front Roe Rest., Inc.,*
  817 S.E.2d 273 (S.C. 2018) ..................................................................................... 12

*Phoenix Light SF Ltd. v. Bank of N.Y. Mellon,*
  2015 WL 5710645 (S.D.N.Y. Sept. 29, 2015)........................................................... 6

*Ronnoco Coffee, LLC v. Westfeldt Brothers, Inc.,*
  2017 WL 635491 (E.D. Mo. Feb. 16, 2017).............................................................. 17

*Rubin v. Mangan,*
  2021 WL 5281347 (E.D.N.Y. Nov. 12, 2021)........................................................ 2, 7

*Seminole Boatyard, Inc. v. Christoph,*
  715 So. 2d 987 (Fla. Ct. App. 1998) ........................................................................ 22

*Sofi Classic S.A. de C.V. v. Hurowitz,*
  444 F. Supp. 2d 231 (S.D.N.Y. 2006)................................................................. 16, 22

iv

*Sturkie v. Sifly,*
    313 S.E.2d 316 (S.C. Ct. App. 1984)................................................................. 15

*Taser Int'l, Inc. v. Phazzer Elecs., Inc.,*
    2023 WL 2523447 (M.D. Fla. Mar. 14, 2023) ................................................ 14, 23

*U.S. v. Fid. Capital Corp.,*
    920 F.2d 827 (11th Cir. 1991) ......................................................................... 16

*Wardell v. Richmond Screw Anchor Co.,*
    133 Ga. App. 378 (Ga. Ct. App. 1974)............................................................. 12

*Wu v. Passive Wealth Builders, LLC,*
    2023 WL 121997 (W.D. Tenn. Jan. 6, 2023) ................................................ 14, 25

*Zhejiang Dushen Necktie Co. v. Blue Med., Inc.,*
    2017 WL 4119604 (S.D. Fla. Sept. 18, 2017) .................................................. 14

## INTRODUCTION

Plaintiffs' Amended Master Personal Injury Complaint ("Master Complaint") asserts two claims against Defendants TPG Inc.; Osteon Holdings, Inc.; Osteon Merger Sub, Inc.; and Osteon Intermediate Holdings II, Inc. (collectively, "TPG Defendants") – (1) Piercing the Corporate Veil and (2) Successor Liability. Contrary to the TPG Defendants' assertions, allowing Plaintiffs to proceed with these claims will not turn any legal precedent on its head. Rather, these are standard common law claims through which Plaintiffs seek to hold the TPG Defendants accountable for their actions under the guise of Exactech, whether in their current or former corporate forms.

Putting the TPG Defendants' hyperbole aside, Defendants' Motion must be denied as the allegations in the Master Complaint are more than sufficient to establish the TPG Defendants' liability for piercing the corporate veil and successor liability under whichever states' laws are applicable. There is no fundamental unfairness in the TPG Defendants remaining in this litigation to answer for their allegedly improper and fraudulent conduct. Importantly, however, it is premature and inappropriate at this juncture to evaluate whether each plaintiff's claims against the TPG Defendants are adequately pled. Defendants' Motion seeks to test the sufficiency of more than 160 individual plaintiff's state specific veil piercing and successor liability allegations. Defendants concede that to rule on their Motion, this Court would be required to perform a fact specific choice of law analysis for each plaintiff. *See* Defs.' Mem., at 7; *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 112 (2d Cir. 2012) (holding that courts must "apply the choice-of-law rules from the transferor forum"). Defendants, however, ignore clear Second Circuit precedent that holds that "choice-of-law determinations are fact-intensive inquiries *that would be premature to resolve at the motion-to-dismiss stage.*" *Bristol-Myers Squibb Co. v. Matrix Labs. Ltd.*, 655 Fed. Appx. 9, at *13 (2d Cir. 2016) (emphasis added) (reversing dismissal where choice of law inquiry was necessary to determine which state law governed the plaintiffs' claims). Indeed, MDL courts

1

have an added duty to "respect each member case's individuality." *In re Paraquat Prods. Liab. Litig.,* 2023 WL 3948249, at *2 (S.D. Ill. June 12, 2023). It would be inconsistent with this duty and the purposes and objectives of multidistrict litigation to engage in a case-by-case sufficiency of the pleadings assessment in an omnibus manner, particularly where the arguments raised are fact-dependent and no discovery has been taken. *See id.* at *3.

Defendants' inappropriate omnibus approach to assessing the pleadings is also premature as the TPG Defendants failed to identify all claims filed against them and cases continue to be filed. In fact, since serving their Motion, Defendants have been named in numerous new lawsuits. (*See* Ex. A - New Case Index.) These and any future filed claims have not yet been briefed or analyzed. Accordingly, Defendants' Motion is not an effective omnibus approach to determining whether they should remain in the litigation, but rather an inefficient half-measure that would require continuous rounds of future briefing to analyze claims as they continue to be filed.

For these many reasons, the TPG Defendants' Motion must be denied. Should the TPG Defendants wish to engage in case-specific motion practice, they should follow Exactech's lead and defer such filings until individual cases are selected for bellwether trials and case specific proceedings get underway. (*See* Ex. B - Nov. 16, 2022 Hearing Tr. at 21:16-25.)

## WELL PLED FACTS AND INFERENCES THAT CAN BE DRAWN THEREFROM THAT MUST BE ACCEPTED AS TRUE

### *TPG and its Business Model*

As set forth in the Master Complaint, TPG Inc. (previously TPG Capital and TPG Partners[1] (collectively referred to hereafter as TPG Inc. or TPG)), is a publicly traded corporation with a business model based on privatizing companies. (MC ¶ 27.) TPG is an active investor in the

---

[1] The TPG Defendants challenge the factual accuracy of several of Plaintiffs' allegations. This is wholly improper as Plaintiffs' allegations must be accepted as true when considering Defendants' Motion. *See Rubin v. Mangan*, 2021 WL 5281347, at *5 (E.D.N.Y. Nov. 12, 2021) (J. Garaufis).

companies it acquires. (MC ¶ 31.) Indeed, TPG touts its ability "to create products and services [that have] delivered breakthrough innovation" in, *e.g.*, the healthcare industry. (MC ¶ 31.)

*TPG Targets Exactech*

In or about mid-2017, TPG targeted Exactech, Inc. – at the time a publicly traded company – as a business to acquire and privatize. (MC ¶ 86.) During its due diligence investigation into Exactech, TPG learned of clinical evidence of early onset failures associated with the Exactech Devices at issue in this litigation. (MC ¶ 159.) Furthermore, TPG learned of Exactech's non-compliance with federal regulations and current good manufacturing practices. (MC ¶ 159.) Nonetheless, TPG decided to proceed with its plans to acquire Exactech.

*TPG Acquires Exactech Using Its Control Over the Osteon Defendants*

To effectuate the takeover, TPG arranged, negotiated, and financed the terms and conditions of the merger. (MC ¶ 98-99.) Recognizing the liability risks associated with Exactech's defective products, TPG created several subsidiaries to stand as buffers between itself and Exactech. The first such entity was Defendant Osteon Holdings, Inc. Osteon Holdings, Inc. was previously known as Osteon Holdings, LP. In documents filed with the SEC related to the Exactech merger, Osteon Holdings, LP is specifically referred to as "a "newly formed limited partnership . . . with de minimis assets." (MC ¶ 95, Ex. C - Ex. 10.1 Letter Agreement.) On October 18, 2017, Osteon Holdings, LP incorporated, becoming Osteon Holdings, Inc. (Ex. D - Sec. of State Info.)[2] On that same day – October 18, 2017 – TPG created the other Osteon Defendants – Osteon Merger Sub, Inc. and Osteon Intermediate Holdings II, Inc. (Ex. D - Sec. of State Info.) Accordingly, the three Osteon Defendants were not long-standing independent companies, but rather corporate masks TPG created and used to take control of Exactech. Indeed, SEC filings admit that Osteon

---

[2] *See, e.g., J & J Sports Prods. v. La Parranda Mexicana Bar & Restaurante Co.,* 2018 WL 4378166, *1 n.3 (E.D.N.Y. Apr. 9, 2018) (holding courts may take judicial notice of information from a secretary of state's website).

Merger Sub and Osteon Holdings are "affiliates" of TPG, meaning they are controlled by TPG. (MC ¶ 100-101, 104, 106.) Such control is further evidenced by the fact that TPG's officers and directors serve as officers and directors of the Osteon Defendants and TPG comingled its money with them. (MC ¶ 125, 158.) Specifically, the $737 million TPG used to purchase Exactech flowed through the newly formed Osteon Defendants to Exactech's shareholders. (MC ¶ 105.)

*TPG Installs the Means to Control Exactech*

While wearing its Osteon mask, TPG negotiated terms for how Exactech would be operated and managed after the merger to ensure TPG maintained control over critical decisions. (MC ¶ 98.) For example, through the Merger Agreement, TPG required that Exactech give the Osteon Defendants the opportunity to "participate in the defense or settlement" of litigation regarding shareholders or other transactions based on the Merger Agreement. (MC ¶ 130-132; Defs.' Ex. 2 Sec. 6.05.) Furthermore, TPG required that Exactech operate using TPG's customary management agreement. (MC ¶ 126-127.) This agreement allowed TPG to direct critical Exactech decisions without the need for unanimous board consent. (*See id*.) Indeed, TPG hand selected three individuals to sit on Exactech's Board: Kendall Garrison – TPG Principal; John Schilling – TPG Partner, Head of Operations; and Todd Sisitsky – TPG President and Co-Managing Partner. (MC ¶ 154-155, 63-65.) In so doing, TPG (a global billion-dollar company) placed its highest-ranking members on Exactech's Board to ensure its $737 million investment was protected. (MC ¶ 161.)

In addition to securing its control of Exactech's Board, TPG ensured it had control over Exactech's day-to-day operations. First, TPG controlled Exactech's most senior employees by requiring TPG approval of Exactech's employee contracts. (MC ¶ 128-129.) TPG then installed its own loyal advisors into key personnel roles at Exactech: Senior Vice President of Business

4

Development – Daniel Hann, Chief Financial Officer – Kerem Bolukbasi, and the person now serving as Chief Executive Officer – Jeffrey Binder. (MC ¶ 60-62, 154.)

*TPG Uses Its Control of Exactech to Harm Plaintiffs*

With its levers of power and control in place on Exactech's Board and heads of operations, TPG did not merely observe and guide Exactech. Rather, TPG dominated and controlled Exactech to serve its own interests. As previously noted, during due diligence in the merger, TPG learned of the significant problems associated with Exactech's devices, including their increased failure rates and Exactech's non-compliance with federal regulations and current good manufacturing practices. (MC ¶ 159, 162.) TPG knew these problems affected significant amounts of Exactech's inventory. (MC ¶ 159, 161-162.) Indeed, prior to the merger, Exactech warned that "[i]n the event that a substantial portion of our inventory becomes obsolete, it would have a material adverse effect on the Company." (MC ¶ 91.) Despite knowing this, TPG did not appropriately infuse Exactech with sufficient capital to address this known liability to allow Exactech to immediately remove the defective products from the market and manufacture non-defective replacement inventory. (*See* MC ¶ 164.) Instead, through its control, TPG directed that Exactech continue selling its inventory of defective devices for three years following the merger. (MC ¶ 157, 161, 163.) Only then, when TPG could no longer hide the problems with Exactech's devices, did TPG make the decision to initiate the recalls of these devices. (MC ¶ 157, 163.) Accordingly, while TPG may not have created Exactech's defective products, it was TPG's decision that they continue to be sold for three years after TPG gained control of Exactech. (MC ¶ 161.) This decision directly harmed countless patients when the defective products they received failed.

Because of TPG's actions, there are grave concerns that Exactech is undercapitalized, insolvent, and unable to make Plaintiffs whole. As noted above, Exactech warned that "[i]n the

5

event that a substantial portion of our inventory becomes obsolete, it would have a material adverse

effect on the Company." (MC ¶ 91.) This warning has proven true. In 2021, Exactech's CFO

presented a "cash flow profile" wherein he reported that the August 2021 recall "created significant

financial difficulty for Exactech[.]" (MC ¶ 164.) The recalls have only expanded since August

2021. (MC ¶ 8-10; MC ¶ 376; MC Ex. D (expanded hip replacement recall); MC ¶ 507; MC Ex.

F (expanded knee and ankle replacement recall).) Moreover, Exactech is facing ever growing

litigation with more than 750 cases filed against it. (Doc. 289 (May 26, 2023 Joint Status Rep).)

According to Exactech's product liability insurance policy, Exactech's self-insured retention is

$250,000 per claim. (*See* MC ¶ 153 (referring to Ex. F - Exactech Certificate of Liability

Insurance).) Accordingly, Exactech, which is already facing "significant financial difficulty," is

potentially liable for more than $185 million in judgments before any insurance is available to it.

Exactech's solvency is certainly in doubt. In light of TPG's control of Exactech that caused

Plaintiffs' significant harm, TPG cannot be allowed to avoid liability by hiding behind the

corporate veils it has, until now, wholly disregarded.

## <u>LEGAL STANDARD</u>

Pleadings have a "low bar" to clear at the motion to dismiss stage. *See, e.g., Phoenix Light

SF Ltd. v. Bank of N.Y. Mellon,* 2015 WL 5710645, at *4 (S.D.N.Y. Sept. 29, 2015); *Ferrer v.

Citigroup Global Mkts., Inc.,* 2011 WL 1322296, at *7 (E.D.N.Y. Mar. 31, 2011) (J. Garaufis). To

withstand a motion to dismiss, a pleading "must contain sufficient factual matter, accepted as true,

to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"A claim has facial plausibility when the pleaded factual content allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 663. When

deciding a Rule 12(b)(6) motion, "the Court must liberally construe the claims, accept all factual

allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Rubin v. Mangan*, 2021 WL 5281347, at \*7 (E.D.N.Y. Nov. 12, 2021) (J. Garaufis).

Additionally, at the motion to dismiss stage, MDL courts provide a degree of leniency when evaluating the sufficiency of claims. For example, experienced MDL jurist Judge Brian Martinotti wrote that in the context of a motion to dismiss a master complaint, "the Court will review, with substantial leniency, the facts that may be specific to each individual Plaintiff or largely within the control of [the Defendant]." *In Re: Allergan Biocell Textured Breast Implant Prods Liab. Litig.,* 537 F.Supp.3d 679, 721-722 (D.N.J. 2021) (denying motion to dismiss manufacturing defect claims because "Plaintiffs may not have access to the confidential information to specifically plead [the Defendant's] deviations"). Likewise, in the *Trasylol* MDL, the Court held that "when the information that may or may not support Plaintiffs' claims is largely within the control of the Defendants," the Court may "assess the sufficiency of plaintiffs' claims with substantial leniency." *In re Trasylol Prods. Liab. Litig.,* 2009 WL 577726, at \*8 (S.D. Fla. March 5, 2009). Where, as here, defendants have control of the information to support (or not support) a plaintiff's claim, the claims should go forward in the interest of justice, reserving adjudication for the summary judgment stage. *Id.*

## ARGUMENT

## I.    DEFENDANTS' MOTION IS PREMATURE AND SHOULD BE DENIED.

Defendants' Motion should be denied as it is premature to engage in the choice of law analysis necessary to determine and apply the law applicable to each plaintiff's claims. In their brief, the TPG Defendants concede that because this litigation is an MDL, to evaluate the sufficiency of each plaintiff's allegations, this Court must "apply the choice-of-law rules from the transferor forum." *Anschutz,* 690 F.3d at 112; (Defs.' Mem., at 7.) Yet as recognized by the Second

7

Circuit, "choice-of-law determinations are fact-intensive inquiries that would be premature to resolve at the motion-to-dismiss stage." *Bristol-Myers Squibb,* 655 Fed. Appx. at *13 (reversing dismissal where choice of law inquiry was necessary to determine which state law governed plaintiffs' claims). Indeed, courts presiding over mass tort litigation routinely deny motions to dismiss that would require choice of law analyses, recognizing it would be premature, inappropriate, improper, and likely impossible "for a court to conduct [a fact-intensive] analysis at the motion to dismiss stage when little or no discovery has taken place." *See, e.g., In re Samsung DLP TV Class Action Litig.,* 2009 WL 3584352, *3 (D.N.J. Oct. 27, 2009). The same is true here.

If this Court is to evaluate the substance of Defendants' Motion, the Court must (1) determine each plaintiff's original/transferor forum, (2) consider that forum's choice of law rules to determine which state's laws apply to each claim, and (3) ultimately compare the relevant state(s) law(s) for each cause of action for each plaintiff to the allegations in the Master Complaint. Each of these steps is heavily fact intensive and wholly inappropriate at this stage of the litigation.

Defendants' Motion highlights the complexity of even the first step – determining a plaintiff's original/transferring forum. In Defendants' Appendix B, they identify 163 plaintiffs purportedly arising from 18 different transferring/original forums. (*See* Defs.' App'x B.) A close look at this appendix, however, reveals significant errors and inappropriate assumptions Defendants are forced to make to advance their arguments without plaintiff-specific discovery.

For example, Defendants identify Plaintiff Mildred Drake as being a direct filed case with an original district of New York. (*Id.* at 2.) Yet Ms. Drake's Short Form Complaint lists her original district as the Eastern District of Pennsylvania. (Ex. G - Mildred Drake SFC.) This calls into question the accuracy of Appendix B which serves as the foundation for Defendants' choice of law analysis. Indeed, Defendants' Motion does not identify or analyze Pennsylvania as a

potentially relevant forum. In addition to this error and omission, Defendants admit that to complete Appendix B without further information from individual plaintiffs, they were required to make assumptions to determine many plaintiffs' transferring/original forums. (*See* Defs.' App'x B n.3.)[3] Defendants cite no authority as to why it would be proper to make such assumptions to determine the outcome of an individual plaintiff's claims.

Next, to determine which states' substantive laws apply, Defendants assume that when a choice of law analysis considers the location of injury, the relevant state is where Exactech's defective device was implanted. (*See* Defs.' App'x A, at 5, 12-16.) Defendants cite no case law for this proposition and do not explain why the state of injury would not be where the plaintiff, *e.g.*, resided at the time of implant, resided when the implant failed, received pre-operative treatment for the implant failure, or received the revision surgery.

Finally, Defendants assume that their attempt at an omnibus motion will allow them to be released from this litigation. Not so. First, Defendants' Motion purports to identify all plaintiffs with claims against the TPG Defendants that have been transferred into the MDL as of June 6, 2023. (*See* Defs.' App'x B n.1.) Defendants' list is incomplete. Plaintiffs have identified at least four MDL plaintiffs with claims against the TPG Defendants that were omitted from Defendants' Appendix B and therefore were not analyzed and are not subject to this Motion. (*See* Ex. A - New Case Index.) Second, this litigation is not stagnant. Since June 6, 2023, at least 21 new plaintiffs have filed claims against the TPG Defendants. (*Id.*) Still more claims will surely be filed after the close of briefing. These new claims have also not been analyzed and are not subject to Defendants' Motion. Accordingly, whatever the outcome of this Motion is, the TPG Defendants will remain in

---

[3] "Certain of those Plaintiffs either did not identify an 'Original District' or identified more than one 'Original District.' These Plaintiffs have been marked with an asterisk (*). For purposes of this analysis only and reserving all rights, the TPG Defendants assume the 'Original District' would be the state the Plaintiff resided in at the time of filing."

this litigation. Only through inefficient and continuous rounds of briefing on each new plaintiff's claims can Defendants hope to remove themselves from this MDL.

Defendants' errors, omissions, and assumptions cannot and should not stand as the foundation for a decision to dismiss any plaintiff's claims. Rather, as recognized by the Second Circuit, it is premature to engage in a choice of law inquiry at this early stage of the litigation. *See Bristol-Myers Squibb,* 655 Fed. Appx. at *13. MDL courts must be "cognizant of [their] duty to respect each member case's individuality." *In re Paraquat,* 2023 WL 3948249, at *2 (citing *Gelboim v. Bank of Am. Corp.,* 574 U.S. 405, 413, n.3 (2015)). As recently recognized in *In re Paraquat,* "[a]n omnibus dismissal of all pending and future [state law] claims, while promoting judicial economy, would likely infringe on each member case's individuality." 2023 WL 3948249, at *2. Indeed, it would be inconsistent with the purposes and objectives of multidistrict litigation to engage in case-by-case assessments of the sufficiency of pleadings in an omnibus manner. *Id.* For these reasons, Defendants' Motion must be denied. If the TPG Defendants wish to proceed with case-specific motion practice on state-law claims, TPG should follow Exactech's lead and reserve such filings for the individual plaintiffs selected in the bellwether process. (*See* Ex. B - Nov. 16, 2022 Hearing Tr. at 21:16-25.)

## II.    PLAINTIFFS' VEIL PIERCING CLAIMS ARE WELL PLED.

If the Court decides to perform a case-by-case analysis of the sufficiency of each plaintiff's veil piercing claims and make the assumptions necessary to determine which state's laws are relevant to each inquiry, it will find the allegations in the Master Complaint more than sufficient.

### A.    Choice of Law

To evaluate the allegations in the Master Complaint for each plaintiff, this Court must apply the choice of law rules from that plaintiff's transferor/original forum to decide which state's law

governs the sufficiency of that plaintiff's veil piercing claims. *See Anschutz.,* 690 F.3d at 112.[4]

Without case specific discovery, this is a speculative task requiring a series of premature and

inappropriate assumptions. (*See supra.*)

As noted above, the TPG Defendants' Appendix B, which is founded on errors and

speculation, purportedly identifies 18 different transferor/original states whose choice of law rules

must be considered. Without waiving any arguments previously raised as to the improper

assumptions and inaccurate determinations used to generate this list, Plaintiffs will proceed to

analyze the choice of law rules applicable to these 18 states.

### 1.    For States With Choice of Law Analyses that Default to the State of Incorporation, Florida Law Applies.

Of the 18 states identified by the TPG Defendants, the choice of law rules applicable to

veil piercing claims in 15 of those states dictates that the substantive law to be applied is the law

of the state of incorporation. (*See* Defs.' App'x A, at 1-4.) Therefore, in these forums, the critical

question is which state of incorporation is relevant.

Here, Plaintiffs seek to pierce Exactech's veil to reach the TPG Defendants. Exactech is

incorporated in Florida. Accordingly, despite the TPG Defendants' insistence that Delaware law

be used to evaluate the Master Complaint, Delaware law has no relevance to whether Plaintiffs'

allegations are adequate to pierce Exactech's veil. *See Nat'l Gear & Piston, Inc. v. Cummins Power*

*Sys., LLC*, 975 F.Supp.2d 392, 401 (S.D.N.Y. 2013) (when trying to pierce a subsidiary's corporate

form to reach a controlling parent, the law of the subsidiary's state of incorporation controls).

---

[4] The TPG Defendants cite to *In re Welding Fume Prod. Liab. Litig.,* 2010 WL 2403355 (N.D. Ohio June 11, 2010) for the proposition that a choice of law analysis is unnecessary in this case. (Defs.' Mem., at 7.) *In re Welding Fume* does not support this position. Rather, the court – on a motion for summary judgment – refused to conduct a choice of law analysis related to veil piercing where this was a "new theory of liability" that was raised for the first time in plaintiffs' response brief and wholly unsupported by the pleading. *Welding Fume*, 2010 WL 2403355, at *8. That is not the case here. Plaintiffs did not invent their veil piercing claims to respond to Defendants' Motion. Rather, Plaintiffs' allegations clearly and sufficiently state this claim in the Master Complaint.

Instead, for those states whose choice of law analyses default to the state of incorporation, the adequacy of the veil piercing allegations must be determined by Florida law. There is no sound basis to look to or cite Delaware law for any guidance at this stage of the analysis.

**2.      Of the States TPG Identifies, At Least Three Do Not Default to the State of Incorporation.**

Defendants admit that not all states' choice of law analyses default to the state of incorporation. (Defs.' Mem., at 7.) For example, Defendants' Motion identifies South Carolina and Georgia as relevant transferor/original forums. Defendants concede that South Carolina and Georgia do not default to the state of incorporation, but rather "look to the law of the state where the alleged tort occurred." (*See* Defs.' Mem., at 8 n.7.)[5] [6] Additionally, despite the TPG Defendants' contention otherwise, many Tennessee courts also refuse to default to the state of incorporation and instead apply Tennessee law to veil piercing claims. *See Church Joint Venture v. Blasingame*, 2016 WL 3248044, at *5 (W.D. Tenn. Jan. 13, 2016), aff'd sub nom., 947 F.3d 925 (6th Cir. 2020). Therefore, when the relevant transferor/originating forum is Georgia, South Carolina, or Tennessee, to determine which substantive law applies to the each plaintiff's veil piercing claims, a case-by-case factual analysis will be necessary to determine, *e.g.,* where the plaintiff's surgery occurred, where they were living at the time of their surgery, when their Exactech device failed, where they were living when it failed, and when and where they underwent revision surgery. These types of detailed, case-specific, factual and legal questions should be handled on a case-by-case basis, not an omnibus motion to dismiss. *Bristol-Myers Squibb Co. v.*

---

[5] *See Auld v. Forbes,* 309 Ga. 893, 894 (2020) ("Georgia has followed the doctrine of *lex loci delicti* in tort cases pursuant to which a tort action is governed by the substantive law of the state where the tort was committed."); *Wardell v. Richmond Screw Anchor Co.,* 133 Ga. App. 378, 380 (Ga. Ct. App. 1974) ("[T]he place of the wrong is the place where . . . there takes place the last event necessary to make an actor liable for an alleged tort." (quotations omitted)).
[6] *See Pertuis v. Front Roe Rest., Inc.,* 817 S.E.2d 273, 278 (S.C. 2018) (rejecting internal affairs doctrine and applying a government interests test); *Dawkins v. State,* 412 S.E. 2d 407, 408 (S.C. 1991) (in South Carolina, "the law of the place where injury was occasioned or inflicted, governs in respect of right of action[.]" (internal quotations omitted)).

*Matrix Labs. Ltd.,* 655 Fed. Appx. at *13; *In re Paraquat Prods. Liab. Litig.,* 2023 WL 3948249, at *2. Nonetheless, for this motion only and without waiving any prior arguments, Plaintiffs will assume that when Tennessee, South Carolina, and Georgia are relevant transferor/original forums, injuries occurred in those states, resulting in the veil piercing laws of Tennessee, South Carolina, and Georgia applying.

### B.    Plaintiffs' Veil Piercing Claims Are Well Pled Under Each State's Law.

"At the motion to dismiss stage, a plaintiff need only allege facts which support a plausible basis for alter ego as a theory of liability." *Colgate-Palmolive Co. v. Lanfranchi North Am., Inc.,* 2020 WL 5440554, at *6 (S.D.N.Y. Sept. 8, 2020) (applying Florida law) (internal quotations and citations omitted). Plaintiffs have done just that by including allegations that are more than sufficient to support a plausible basis to pierce Exactech's veil under Florida, Tennessee, South Carolina, and Georgia law. As will be demonstrated below, while each state's veil piercing analysis is different, there are two consistent elements that must be demonstrated: (1) domination and control by one person/entity over another; and (2) through that domination and control, the commission of fraudulent, improper, or otherwise unjust acts resulting in harm to plaintiffs.

#### *Florida Law*

Under Florida law, to pierce the corporate veil, a plaintiff must establish: "(1) that the person dominated and controlled the corporation; (2) the corporate form was used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the plaintiff." *Est. of Jackson v. Schron,* 2016 WL 4718145, at *8 (M.D. Fla. Sept. 8, 2016) (citing *In re Hillsborough Holdings Corp.,* 166 B.R. 461, 468-69 (Bankr. M.D. Fla. 1994)).

To adequately plead a person's domination and control of a corporation, the complaint must show a "blurring of the corporate lines, such as . . . using a corporation for the stockholder's personal interest." *Century Sen. Servs. v. Consumer Health Ben. Ass'n,* 770 F.Supp.2d 1261, 1265

13

(S.D. Fla. 2011) (citing *Dania Jai-Alai Palace v. Sykes,* 450 So.2d 1114, 1121 (Fla. 1984));

*Zhejiang Dushen Necktie Co. v. Blue Med., Inc.,* 2017 WL 4119604, *5 (S.D. Fla. Sept. 18, 2017)

(same). For example, allegations that a person installed owners of a company while themselves

exercising control and reaping the economic benefits of that control are considered adequate to

demonstrate domination and control and overcome a motion to dismiss. *See Taser Int'l, Inc. v.*

*Phazzer Elecs., Inc.,* 2023 WL 2523447, at *2 (M.D. Fla. Mar. 14, 2023).

In addition to allegations of domination and control, the complaint must also contain

allegations that the subsidiary was used for an improper, illegal, fraudulent, or other unjust

purpose. *See Aldana v. Fresh Del Monte Produce Co.,* 2007 WL 7143959, at *6 (S.D. Fla. Aug.

30, 2007); *Aztec Motel, Inc. v. State ex rel. Faircloth,* 251 So. 2d 849, 852 (Fla. 1971); *Bellairs v.*

*Mohrmann,* 716 So. 2d 320, 323 (Fla. 2d DCA 1998).

### *Tennessee Law*

Under Tennessee law, to pierce the corporate veil a plaintiff must establish: (1) complete

domination of a parent over its subsidiary; (2) such control was used to commit fraud or wrong,

perpetuate the violation of a statutory or other positive legal duty, or commit a dishonest and unjust

act; and (3) the control and breach of duty must proximately cause the injury or unjust loss

complained of. *See Cont'l Bankers Life Ins. Co. of the S. v. Bank of Alamo*, 578 S.W.2d 625, 632

(Tenn. 1979).

To adequately plead domination and control, the alleged facts and inferences that can be

drawn therefrom must establish that the parent corporation so dominated the subsidiary's policies

and business practices related to the allegedly tortious action or transaction, that the subsidiary had

no separate mind, will, or existence. *See Cont'l Bankers*, 578 S.W.2d at 632; *Wu v. Passive Wealth*

*Builders, LLC,* 2023 WL 121997, at *4-5 (W.D. Tenn. Jan. 6, 2023) (holding that allegations,

including those on information and belief, were sufficient to overcome a motion to dismiss veil piercing claims; also recognizing that dismissing these claims without discovery would be premature as the facts that would clarify the relationship between the entities are within the defendants' control).

When considering whether domination and control has been proven, Tennessee courts look at a variety of factors, most relevant of which are: undercapitalization of the subsidiary, employment of the same employees or attorneys, the use of the corporation as an instrumentality or business conduit for another corporation, and the failure to maintain arm's length relationships among related entities. *See Fed. Dep. Ins. Corp. v. Allen,* 584 F. Supp. 386, 397 (E.D. Tenn. 1984).

Once sufficient domination and control is established, it must be proven that control over the subsidiary was "used to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in the contravention of third parties' rights." *Cont'l Bankers*, 578 S.W.2d at 632.

### *South Carolina Law*

Under South Carolina law, to pierce the corporate veil, a plaintiff must establish "total domination and control of one entity by another and inequitable consequences caused thereby." *Gen. Holding, Inc. v. Cathcart*, 2009 WL 9119981, *16 (D.S.C. July 29, 2009) (citations omitted).

South Carolina courts consider multiple factors to determine whether one entity dominates and controls another, most relevant of which are: undercapitalization, observance of corporate formalities, insolvency of the debtor corporation, and whether the subsidiary corporation was merely a façade for the operations of the dominant stockholder. *See Sturkie v. Sifly,* 313 S.E.2d 316, 318 (S.C. Ct. App. 1984). Whether a subsidiary has been used as a façade is afforded greater

15

weight than other factors. *See Sofi Classic S.A. de C.V. v. Hurowitz,* 444 F. Supp. 2d 231, 242-243 (S.D.N.Y. 2006) (citing *Hunting v. Elders,* 597 S.E.2d 803, 807 (S.C. Ct. App. 2005)).

Additionally, South Carolina courts require a showing of inequitable consequences caused by the domination and control of one entity by another. *Oskin v. Johnson,* 400 S.C. 390, 400 (S.C. 2012). In other words, the corporate veil will be pierced where the retention of corporate personalities would promote "fraud, wrong or injustice or would contravene public policy." *Mid-South Mgmt. Co. v. Sherwood Dev. Corp.,* 374 S.C. 588, 604 (S.C. Ct. App. 2007).

### *Georgia Law*

Under Georgia law, courts pierce the corporate veil "to remedy injustices which arise where a party has overextended his privilege in the use of a corporate entity in order to defeat justice, perpetrate fraud or evade contractual or tort responsibility." *Paul v. Destito*, 250 Ga. App. 631, 639 (Ga. Ct. App. 2001).

To succeed on this claim, a plaintiff must establish that an individual "disregarded the corporate entity and made it a mere instrumentality for the transaction of their own affairs; that there is such unity of interest and ownership that the separate personalities of the corporation and owners no longer exist." *Baillie Lumber Co. v. Thompson,* 612 S.E.2d 296, 299 (Ga. 2005).

Additionally, a plaintiff must establish that the controlling entity abused its position "'by using the corporate form to defeat justice, perpetuate fraud, promote crime, evade contractual or tort responsibility, or for any other reason which in equity or good conscience would justify the disregard of the corporate entity[.]'" *One Step Up., Ltd. v. Wahoo Creek Trading Co.,* 2020 WL 13596325, at *9 (N.D. Ga. July 6, 2020) (quoting *U.S. v. Fid. Capital Corp.*, 920 F.2d 827, 836-837 (11th Cir. 1991)).

1.      **The Master Complaint Adequately Pleads Domination and Control.**

The Master Complaint contains myriad factual allegations demonstrating the TPG Defendants' domination and control over Exactech. Throughout their Motion, however, Defendants claim that Plaintiffs fail to use common veil piercing terms such as "undercapitalize," "façade," "insolvency," etc. (Defs.' Mem., at 10-12, 15.) Yet, the use or non-use of such terms does not control the adequacy of a pleading. The adequacy of a pleading is determined by the factual allegations. Here, Plaintiffs' well pled factual allegations establish all the necessary elements of veil piercing under the laws of Florida, Tennessee, South Carolina, and Georgia.

As set forth above and in the Master Complaint, in or about mid-2017, TPG – not the Osteon Defendants – targeted Exactech as a company it sought to acquire. (MC ¶ 86, 98-99.) While performing due diligence, TPG became aware of Exactech's defective products and failure to follow federal regulations during the manufacturing process. (MC ¶ 159, 162.)[7] Despite this, TPG continued with its acquisition plan and, to protect itself, invented no less than three entities – the Osteon Defendants – to stand between Exactech and TPG. (MC ¶ 92, 105-106, 113-115.) These Osteon Defendants were mere sham entities TPG could wear as a mask while negotiating, financing, and finalizing the merger. They were all created on the same day, lacked assets, shared officers and directors with TPG, and served as a funnel through which TPG's funds flowed to finance Exactech's acquisition. (*See* Ex. D; Ex. C; MC ¶ 125, 158, 38, 105.) Indeed, while the Osteon Defendants' names appeared on the merger and acquisition documents, these newly formed entities with de minimis assets did not control the process. (MC ¶ 98-99, 100, 105.) TPG did.

---

[7] The TPG Defendants cite to *Ronnoco Coffee, LLC v. Westfeldt Brothers, Inc.,* 2017 WL 635491 (E.D. Mo. Feb. 16, 2017) for the odd proposition that by alleging TPG gained knowledge about Exactech during due diligence, Plaintiffs acknowledge that TPG did not control Exactech's actions "throughout." (Defs.' Mem., at 20.) It is unclear what point the TPG Defendants are making. Plaintiffs do not allege that TPG controlled Exactech's actions *prior* to the start of merger discussions. Plaintiffs allege the TPG Defendants learned of Exactech's defective products during merger due diligence and then through the merger, the TPG Defendants took control of Exactech and in particular the decision making about what to do with Exactech's defective products.

As set forth in the Master Complaint, the TPG Defendants comingled their liabilities with Exactech. Indeed, the Merger Agreement required Exactech to give Osteon Holdings the right to "participate in the defense or settlement" of any litigation regarding shareholders or otherwise arising out of "transactions contemplated by the Agreement." (MC ¶ 131; Defs.' Ex. 2 Sec. 6.05.) The TPG Defendants have little response to this other than to wholly misquote the Merger Agreement. Specifically, the Defendants challenge the accuracy of Plaintiffs' allegations, telling the Court that through the Merger Agreement "Osteon Holdings, Inc. merely reserved the right to 'participate in the *defense*' of 'any security holder litigation . . . *related to the merger*.'" (Defs.' Mem., at 17 (emphasis original).) This is not what the Merger Agreement says. Rather, it states:

> "The Company shall give Parent the opportunity to reasonably participate in the defense *or settlement* of any shareholder litigation against the Company and/or its directors, officers or significant shareholders relating to the Merger *and the other transactions contemplated by this Agreement.*"

(Defs.' Ex. 2 Sec. 6.05 (emphasis added); MC ¶ 131.) Accordingly, as pled and confirmed by the Merger Agreement, Defendants comingled their liability with Exactech.

As set out in the Master Complaint, in addition to comingling liabilities with Exactech, TPG ensured its control of all aspects of Exactech's business. Specifically, TPG imposed an agreement on Exactech whereby board level decisions did not require unanimous consent. (MC ¶ 126.) TPG then installed board members who were not mere TPG loyalists, but rather the highest-ranking officers at TPG, including TPG's head of operations and president and co-managing partner. (MC ¶ 63-65, 155.) TPG asserts this is not evidence of special treatment. (Defs.' Mem., at 15.) Only discovery will reveal whether that is true. At this juncture, however, it is reasonable to infer that when TPG – a company with $135 billion in assets – placed its own head of operations and president and co-managing partner on Exactech's Board, TPG was expecting and asserting a significant amount of control and influence over Exactech.

In addition to this control and influence over Exactech's Board, the Master Complaint alleges TPG controlled Exactech's day-to-day operations. For example, TPG required control over key employee contracts and installed its own advisors into the highest echelons of Exactech's operations. (MC ¶ 128-129, 154, 60-62.) In so doing, TPG ensured control over Exactech's decision-making at the Board and operations levels.

While a parent company is permitted to be directly involved with a subsidiary, acceptable involvement includes monitoring performance, supervising finance or budget decisions, and articulating general policies or procedures. *See Classic Soft Trim v. Albert,* 2020 WL 6734402, at *5 (M.D. Fla. Aug. 13, 2020). Plaintiffs allege TPG was far more involved at Exactech.[8] In acquiring Exactech with knowledge that its inventory of medical devices was defective and obsolete, TPG knew Exactech's long term solvency – and thereby TPG's $737 million investment – was at risk. (MC ¶ 91, 159.) Indeed, prior to being acquired, Exactech stated in SEC filings: "[i]n the event that a substantial portion of our inventory becomes obsolete, it would have a material adverse effect on the Company." (MC ¶ 91.) Given the risk of this investment, it is of little surprise that TPG placed its most important personnel into Board and lead operation level roles, thereby ensuring TPG controlled how Exactech's defective inventory would be handled. First, TPG tried to hide the problem and directed Exactech to continue selling its inventory of defective devices for three years. (MC ¶ 161, 163.) When TPG could no longer hide the problem, TPG then controlled when and how the recall of Exactech's Defective Devices would occur. (MC ¶ 157, 162, 163, 168.) These allegations demonstrate TPG engaged in far more than mere supervision and guidance, instead dominating and controlling Exactech's, *e.g.*, sales, marketing, manufacturing, and

---

[8] Defendants erroneously claim that Plaintiffs fail to allege TPG was involved in any way in, *e.g.*, "the sale of a single Exactech device" and that Plaintiffs fail to assert a direct cause of action against TPG. (Defs.' Mem., at 3.) This is untrue. As set forth throughout the Master Complaint and herein, Plaintiffs allege TPG's direct involvement in the sale and delayed recall of Exactech's defective devices leading to Plaintiffs' harm.

regulatory affairs. Indeed, TPG's domination and control was used to further TPG's interest, not Exactech's.

Knowing of the significant problems with Exactech's devices, TPG could have appropriately capitalized Exactech by immediately accounting for the cost to remove the defective products from circulation, manufacturing replacement products, and addressing any resulting litigation. Instead, TPG left Exactech undercapitalized and on the brink of insolvency. As set out in the Master Complaint, in a November 2021 "cash flow profile" presentation given by Exactech's CFO, he reported that the August 2021 recall "created significant financial difficulty for Exactech." (MC ¶ 164.) It is wholly reasonable to infer therefrom that the repeated expansion of Exactech's recalls after August 2021 further exacerbated Exactech's "significant financial difficulty," thereby jeopardizing Exactech's solvency. (MC ¶ 164, 376; MC Ex. D (expanded hip recall); MC ¶ 507; MC Ex. F (expanded knee and ankle recall).) Such solvency and capitalization is even more in doubt when considering the substantial and ever-growing litigation facing Exactech. While Exactech has insurance for product liability claims, its self-insured retention is $250,000 per claim. (*See* MC ¶ 153 (referring to Ex. F - Exactech Cert. of Liability Insurance).) As is reflected in the May 26, 2023 Joint Status Report (Doc. 289), there are more than 750 cases pending against Exactech. Assuming no additional cases are filed, Exactech faces close to $200 million in out-of-pocket payments before insurance provides any coverage. (*Id*.) Accordingly, TPG placed its own short-term profits over Exactech's continued viability and Plaintiffs' health.

Taking all of these well pled factual allegations as true and construing all reasonable inferences that can be drawn therefrom in Plaintiffs' favor, Plaintiffs' allegations are more than adequate under the laws of Florida, Tennessee, South Carolina, and Georgia to demonstrate the TPG Defendants' domination and control over Exactech.

2.    **The Master Complaint Adequately Pleads that the TPG Defendants'
Improper or Fraudulent Use of Exactech Harmed Plaintiffs.**

In addition to these well pled allegations of domination and control, Plaintiffs' Master

Complaint also sets forth clear allegations that the TPG Defendants used Exactech for an improper,

fraudulent, unjust, and dishonest purpose that caused direct harm to Plaintiffs. These allegations

are sufficient under Florida, Tennessee, South Carolina, and Georgia law.

As set forth above and in the Master Complaint, Plaintiffs allege that the TPG Defendants

used their control of Exactech to knowingly direct the continued sale of defectively manufactured,

designed, and labeled products. (MC ¶ 161-163, 168.) Likewise, Defendants delayed the recall of

these defective products in violation of the Food, Drug & Cosmetic Act. (*See* MC ¶ 157-163, 168,

179-180, 184.) By ordering the continued sale and delayed recall of defective medical devices,

TPG's actions directly led to numerous patients being implanted with defective Exactech products

that ultimately failed. Such actions were clearly improper, unjust, fraudulent, and dishonest. *See*

*Kleweis v. Transport Support,* 972 F. Supp. 494, 496 (E.D. Mo. 1997) (holding that the evidence

of a failure to disclose product safety information was sufficient to establish the use of a subsidiary

for an improper purpose); *Garcia v. Coffman,* 946 P.2d 216, 221 (N.M. Ct. App. 1997) (holding

proof of a person's direction and use of a subsidiary "in a scheme to generate income through the

provision of unnecessary medical services is substantial evidence of an improper purpose").

Not only did TPG use Exactech's corporate form to defraud and harm Plaintiffs through

Exactech's defective devices, but TPG also intentionally used the corporate forms of Exactech and

the Osteon Defendants to attempt to escape liability for its actions. First, prior to directing the

continued sale of Exactech's defective products, TPG attempted to insulate itself by inventing the

Osteon Defendants and installing them as shields behind which it could attempt to hide from the

consequences of the actions it took under the façade of Exactech. (*See* Ex. D; MC ¶ 98, 100-106,

125-129.) Next, TPG grossly undercapitalized Exactech, leaving Exactech approaching insolvency due to the recalls TPG delayed and substantial litigation Exactech now faces. (MC ¶ 91, 164; Doc. 289 (May 26, 2023 Joint Status Rep); Ex. F.) Now, as a result of TPG's domination and control of Exactech, Plaintiffs have suffered significant injuries, yet have little hope of being made whole by the corporate masks TPG used to harm them. Contrary to Defendants' assertions, but consistent with the Master Complaint, TPG is attempting to "[run] from its liabilities through a complicated corporate structure[.]" (Defs.' Mem., at 25.) It must not be permitted to do so. For the reasons set forth above, the allegations in the Master Complaint are more than sufficient under the laws of Florida, Tennessee, South Carolina, and Georgia to establish that the TPG Defendants improperly, fraudulently, and unjustly used Exactech resulting in direct harm to Plaintiffs. *See Sofi Classic,* 444 F. Supp. 2d at 242-243 (an entity "cannot be allowed to hide from the normal consequence of carefree entrepreneuring by doing so through a corporate shell." (citations omitted)); *Seminole Boatyard, Inc. v. Christoph*, 715 So. 2d 987, 990 (Fla. Ct. App. 1998) (in veil piercing case, finding "[w]hether there has been improper conduct is a jury question." (quotation omitted)).

\* \* \* \* \* \*

When considering the well-pled factual allegations in the Master Complaint and all reasonable inferences that can be drawn therefrom, it is clear that Plaintiffs' pleading is sufficient to pierce Exactech's veil under the laws of Florida, Tennessee, South Carolina, and Georgia.

### C. Once Exactech's Veil is Pierced, Each TPG Defendant May be Held Liable.

Once Exactech's veil has been pierced, the question turns to whether Plaintiffs must sequentially pierce the veil of each Osteon Defendant and other unknown corporate parents to reach TPG. The answer to this question is clearly "no." As recognized by numerous courts facing similar factual scenarios, including those in Delaware and Florida, the target of veil piercing claims

22

is the person or entity in control, which need not be the immediate corporate parent. For example, in *In re Maxus Energy Corp.,* 641 B.R. 467 (Bankr. D. Del. 2022), a corporate entity had many subsidiaries between itself and the injured party. Like the TPG Defendants here, the corporate parents in *Maxus* argued that, to reach the highest entity in a corporate ladder, each sequential corporate layer must be pierced. The *Maxus* court rejected that argument. The court noted that the purpose of alter ego veil-piercing is "to hold the party actually responsible for the inequitable conduct accountable," not merely the sequential parent. *Id.* at 557.

A recent Florida District Court opinion reached the same conclusion – control, not immediate corporate parentage, is the critical factor to determine who can be held liable for piercing the corporate veil. *See Taser Int'l, Inc. v. Phazzer Elecs., Inc.,* 2023 WL 2523447 (M.D. Fla. March 14, 2023). In *Taser*, the court held that a family patriarch that controlled a company could be liable under a theory of veil piercing despite not officially owning the company whose veil was to be pierced. The *Taser* court was clear that the critical question is control and "[a]lter ego liability should not be defeated by semantics or gamesmanship."[9] *Id.* at *2; *see also, One Step Up, Ltd. v. Wahoo Creek Trading Co.*, 2020 WL 13596525, at *10 (D. Ga. July 6, 2020) (holding that alter ego allegations were sufficient against a defendant who, while not a member, manager, or employee of the alter ego, had "dominant and pervasive control over the affairs of the [alter ego]."); *Hagan v. Armstrong Int'l*, 2020 S.C.C.P. LEXIS 649, at *15 (June 29, 2020) (holding that the issue for alter ego analysis is whether the defendant maintained the requisite amount of control and injustice occurred as a result, not whether the defendant is a corporation shareholder, director, or officer). As set forth at length above and in the Master Complaint, TPG controlled and dominated Exactech. Accordingly, if Exactech's veil is pierced, there is no need to sequentially

---

[9] *Maxus* and *Taser* are more recent than the cases Defendants rely upon for their sequential piercing arguments.

pierce through each Osteon Defendant in order to reach TPG. TPG's semantics and gamesmanship are illegitimate defenses to veil piercing.

For these many reasons, Defendants' Motion to Dismiss Plaintiffs' veil piercing claims must be denied.

## III. DEFENDANTS' MOTION FAILS TO ADDRESS THE THEORY OF SUCCESSOR LIABILITY PURSUED BY PLAINTIFFS.

In arguing for the dismissal of Plaintiffs' successor liability claims, the TPG Defendants presume that Plaintiffs allege they are liable as Exactech's successors. (Defs.' Mem., at 21-24.) That is incorrect. Rather, Plaintiffs seek to hold the TPG Defendants liable as successors to their own prior corporate forms that were directly involved in the merger with and the domination and control of Exactech that gives rise to Plaintiffs' veil piercing claims.

The TPG Defendants have changed forms between the time they first targeted Exactech in 2017 and the present. For example, in 2018, Osteon Holdings, LP incorporated and became Defendant Osteon Holdings, Inc. (*See* Ex. D - Sec. of State Info.; MC ¶ 105.) Likewise, Defendant TPG Inc. was formed in 2021 from TPG Partners, LLC and TPG Capital, LP. (MC ¶ 25-26.) The TPG Defendants make it clear that they will attempt to use these changes in corporate form to avoid liability. Indeed, in their letter requesting a pre-motion conference, the TPG Defendants emphasize that: "Critically, TPG Inc. was not involved in the [merger] whatsoever because, as Plaintiffs acknowledge, ***it did not even exist*** until December 2021." (Doc. 176 at 1 (emphasis original).) While Defendants may seek to use these changes in corporate form as a defense, Defendants' Motion fails to raise this as a basis for dismissal at the pleading stage. Accordingly, Defendants' Motion to Dismiss Plaintiffs' successor liability claims must be denied. *See Alford v. City of New York,* 413 F.Supp.3d 99, 108-109 (E.D.N.Y. 2018) ("It is well established that arguments may not be made for the first time in a reply brief. Therefore, new arguments first raised

24

in reply papers in support of a motion will not be considered." (internal quotations and citations omitted)).

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss. If, however, the Court finds that any of Plaintiffs' claims are inadequately pled, Plaintiffs request permission to move this Court for leave to amend their Master Complaint.

Since filing the Master Complaint, Plaintiffs have become aware of additional facts relevant to their claims against the TPG Defendants. As one example, Plaintiffs have learned that while TPG purchased Exactech for $737 million, through the merger with Osteon Merger Sub, Inc., Exactech became responsible for a $235 million loan associated with this purchase, thereby further comingling these entities' funds and liabilities and also exacerbating Exactech's undercapitalization and insolvency. Because the majority of the information regarding the TPG Defendants' relationship with Exactech is in the hands of the TPG Defendants, if this Court were inclined to lift the stay on discovery against TPG, Plaintiffs could expeditiously take targeted discovery to further support their veil piercing and successor liability claims. *See Wu v. Passive Wealth Builders, LLC,* 2023 WL 121997, at *5 (W.D. Tenn. Jan. 6, 2023) (recognizing that dismissing veil piercing claims without discovery would be premature as the facts that would clarify the relationship between the entities are within the defendants' control).

While Plaintiffs do not presently believe the addition of new facts are needed to overcome the TPG Defendants' Motion, should the Court find Plaintiffs' Master Complaint deficient, Plaintiffs request the opportunity to move for leave to amend, with which Plaintiffs would include a proposed amended complaint that alleges additional facts and addresses any deficiencies identified by this Court.

Dated: July 14, 2023

Respectfully Submitted,

*/s/ N. Kirkland Pope*

N. Kirkland Pope
**POPE McGLAMRY, P.C.**
3391 Peachtree Road, #300
Atlanta, GA 30326
Phone: (404) 523-7706
Fax: (404) 524-1648
Email: kirkpope@pmkm.com

Ellen Relkin
**WEITZ & LUXENBERG, P.C.**
700 Broadway
New York, NY 10003
Phone: (212) 558-5500
Fax: (212) 344-5461
Email: erelkin@weitzlux.com

**PLAINTIFFS' LEAD COUNSEL**

*Attorneys For Personal Injury Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 14, 2023, Plaintiffs served a copy of Plaintiffs' Response In Opposition To Defendants TPG Inc.; Osteon Holdings, Inc.; Osteon Merger Sub, Inc. And Osteon Intermediate Holdings II, Inc.'s Motion To Dismiss via electronic mail on the following counsel for the TPG Defendants:

Jay P. Lefkowitz
Mark Premo-Hopkins (*pro hac vice*)
Christa Cottrell (*pro hac vice*)
Cameron Ginder (*pro hac vice*)
**KIRKLAND AND ELLIS LLP**
300 North LaSalle Street
Chicago, Illinois 60654
+1 (312) 862-2000
+1 (312) 862-2200
jay.lefkowitz@kirkland.com
mark.premohopkins@kirkland.com
ccottrell@kirkland.com
cameron.ginder@kirkland.com

Dated: July 14, 2023

*/s/ David C. Harman*
David C. Harman