# Exhibit B

1

1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - - X
3
    IN RE:                   :     22-MD-3044(NGG)(MMH)
4
       EXACTECH POLYETHYLENE   :     United States Courthouse
5      ORTHOPEDIC PRODUCTS           Brooklyn, New York
       LIABILITY LITIGATION,   :
6                                    August 22, 2023
                                     2:00 p.m.
7   - - - - - - - - - - - - - - X

8              TRANSCRIPT OF STATUS CONFERENCE
         BEFORE THE HONORABLE MARCIA M. HENRY
9          UNITED STATES MAGISTRATE JUDGE.

10  APPEARANCES:

11  For the Plaintiffs:          POPE McGLAMRY, P.C.
                                 3391 Peachtree Road, NE
12                               Atlanta, Georgia  30326

13                               BY: N. KIRKLAND POPE, ESQ.

14                               WEITZ & LUXENBERG, P.C.
                                 700 Broadway
15                               New York, New York  10003

16                               BY:  ELLEN RELKIN, ESQ.

17                               SAUNDERS & WALKER, PA
                                 3491 Gandy Boulevard North
18                               Pinellas Park, Florida  33781

19                               BY:  JOSEPH H. SAUNDERS, ESQ.

20                               ROBINS, KAPLAN LLP
                                 1325 Avenue of the Americas
21                               New York, New York  10019

22                               BY:  RAYNA KESSLER, ESQ.

23                               ZOLL & KRANZ, LLC
                                 6620 West Central Avenue
24                               Suite 100
                                 Toledo, OH  43617
25
                                 BY:  CARASUSANA B. WALL, ESQ.

CMH      OCR      RDR      FCRR

2

```
 1   APPEARANCES:   (Continued)

 2
     For the Deft. Exactech:       FAEGRE DRINKER BIDDLE
 3                                      & REATH LLP
                                   320 South Canal Street
 4                                 Chicago, IL  60606

 5                                 BY: MICHAEL J. KANUTE, ESQ.
                                       SUSAN M. SHARKO, ESQ.
 6                                     RUBEN I. GONZALEZ, ESQ.
                                       J. STEPHEN BENNETT, ESQ.
 7
     Court Reporter:               Charleane M. Heading
 8                                 225 Cadman Plaza East
                                   Brooklyn, New York
 9                                 (718) 613-2643

10   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
11

12                      *      *      *      *

13

14            THE CLERK:  Civil cause for status conference, case

15   number 22-MD-3044, In Re:  Exactech Polyethylene Orthopedic

16   Products Litigation.

17            Counsels beginning with plaintiff, please state your

18   appearances for the record.

19            MS. RELKIN:  Good afternoon, Your Honor.  Ellen

20   Relkin from Weitz & Luxenberg for the plaintiffs.

21            THE COURT:  Good afternoon.

22            MS. WALL:  Good afternoon, Your Honor.  Carasusana

23   Wall from Zoll & Kranz for plaintiffs.

24            THE COURT:  Afternoon.

25            MR. POPE:  Good afternoon, Your Honor.  Kirk Pope of
```

3

1   Pope McGlamry for plaintiffs.

2        THE COURT:  Good afternoon.

3        MR. SAUNDERS:  Joseph Saunders for the plaintiffs.

4        THE COURT:  Good afternoon.

5        MS. KESSLER:  Good afternoon, Your Honor.  Rayna

6   Kessler for the plaintiff.

7        THE COURT:  Good afternoon.

8        MR. KANUTE:  Good afternoon, Your Honor.  Mike

9   Kanute from the Faegre Drinker firm for the Exactech

10  defendants.

11        THE COURT:  Good afternoon.

12        MR. GONZALEZ:  Good morning, Your Honor.  Ruben

13  Gonzalez from Faegre Drinker also for Exactech.

14        THE COURT:  Good afternoon.

15        MS. SHARKO:  Susan Sharko, Faegre Drinker, for the

16  Exactech defendants.

17        THE COURT:  Good afternoon.

18        MR. BENNETT:  Good afternoon, Your Honor.  Stephen

19  Bennett, Faegre Drinker, for the Exactech defendants.

20        THE COURT:  Good afternoon.

21        All right, everyone.  So we are here for a

22  previously scheduled status conference in this multi-district

23  litigation.  Our last status conference was in June and since

24  then, there have been a number of filings, some of which will

25  be addressed in today's session.

4

1          I just want to start with the most recent status

2    report and I think a request from the parties to have a joint

3    conference with Judge Garaufis.  Judge Garaufis is not here

4    today and I think at this point, given the status of the

5    bellwether plans both here as well as in the Florida cases,

6    that that request likely would have been declined even if he

7    were available as premature at this point, but certainly

8    something that can be revisited later.

9          For now, my plan today is to go over some of the

10   matters that are discussed in your status report and also to

11   decide the motion relating to ESI.

12         I will note that I am -- it appears as though your

13   respective positions may have evolved somewhat from the

14   initial motion papers from then until today, so part of

15   today's conference is to get some clarification on what

16   specifically plaintiffs are seeking and what specific

17   objections, if any, the Exactech defendants have.

18         I note for the record that, one, the third-party

19   plaintiffs are no longer parties in this multi-district

20   litigation pursuant to Judge Garaufis' order dismissing them

21   from the case and their failure to amend their complaint.  I

22   have also excused the TPG defendants from this conference

23   because discovery was stayed as to them.

24         All right.  So why don't we start with the status

25   report.  It's typically Mr. Kanute who tells me the updated

5

1   number of cases since those status reports.

2           Why don't you start, Mr. Kanute.

3           MR. KANUTE:  Thank you, Your Honor.

4           The numbers have changed just a bit since we filed

5   the joint status report in the MDL as well as the related

6   Florida litigation and litigation in other states continues to

7   grow, but as of this past Friday, there were a total of

8   838 cases in this MDL of which 679 involve knee products, 148

9   involve hips, 10 of which were ankle cases.

10          Then in Florida, since Friday, a couple more cases

11  were filed.  We're up to 274 pending in Alachua County before

12  Judge Keim.  And of those, 192 are knee cases and 78 are hip

13  cases.

14          Then the state court cases, the jurisdiction where

15  we've seen the most activity is in Illinois, we're up to

16  14 cases now filed by one plaintiffs' firm with the promise of

17  more to follow, and then there have been a couple of others

18  filed in California and other states as well.

19          THE COURT:  Okay.  All right.  Thank you very much.

20          Well, I will say that our rate has slowed down since

21  our last status.  We usually are up at least 50 percent more

22  at every status conference and so this new number seems a

23  little bit lower.

24          In any event, let me just ask about the 30(b)(6)

25  deposition.  Did that take place on August 15th?

6

1          MS. WALL:  Your Honor, Cara Wall for the plaintiffs.

2          Yes, it did.  We did that last week.

3          THE COURT:  Any issues relating to that that you

4  wanted to raise?

5          MS. WALL:  Not for plaintiffs, Your Honor.

6          MR. GONZALEZ:  Not from the Exactech defendants,

7  Your Honor.

8          THE COURT:  All right.  Thank you.

9          So let's get to this ESI discovery issue.

10          So I have -- well, I have a few filings related to

11  same.  There have been a few filings since the last

12  conference.  There were the defense, we'll call them

13  "updates," in air quotes, on July 7th at Documents 347 and

14  348.  348 dealt with the search terms issue and sort of

15  flagging it for the court.  And then on July 11th,

16  Document 351 was the plaintiffs' response to the updates from

17  the defense.  The full-blown motion in which plaintiffs are

18  asking for specific relief was filed on July 21st at

19  Document 371, with a response filed on July 28th at

20  Document 377.

21          Frankly, given the nature of the dispute, I didn't

22  believe that a standalone conference was necessary because I

23  knew that we would be discussing these issues today.

24          My primary question, and I'm going to start with the

25  plaintiffs here, in reviewing your letter of July 21st, at

7

1    371, and then looking at some of the information you provided

2    in the status report at Document 392 as of August 11th, what

3    specifically are you asking the court to do?

4          It sounds like one of the most obvious questions but

5    before I issue any orders, I thought that I would ask what it

6    is that you want because, and I'll add to this, in the status

7    report, it seemed as though the meet and confer and,

8    particularly, the meeting with the E-discovery vendor in this

9    case, may have addressed some of your initial concerns but I

10   honestly can't tell so I just wanted to start with what would

11   you like to have happen.

12         MR. POPE:  Thank you, Your Honor.  Kirk Pope.  I'll

13   give the short answer and then a little bit of context will

14   help you.

15         So what the plaintiffs are asking is that there are

16   specific documents that have been hit on an ESI search of a

17   group of documents that the defendants had, where the

18   defendants had used our search terms in order to go through

19   that process.

20         So as to those ten custodians that were identified

21   and agreed to, their Outlook folders were used for the basis

22   upon which to run our search terms and those were identified

23   and have been, according to the papers now, culled out and

24   held by defendants.  We seek for those to be produced.

25         THE COURT:  Okay.  Now, when you say "those,"

8

1   because I'm looking at page 11 of this status report where --

2   I'll read the quote.  It's at the bottom of the page.  It

3   says:  "Plaintiffs now understand that the Exactech defendants

4   have selected approximately 2.1 million documents from the

5   Outlook mailboxes of 12 custodians.  Plaintiffs' search terms

6   resulted in 123,321 unique documents out of the approximately

7   460,000 total documents containing search terms when applied

8   to those 2.1 million documents."

9           So of those different groups and subsets of

10  documents, which ones do you want me to order the production

11  of?

12          MR. POPE:  123,321, Your Honor.

13          THE COURT:  Okay.  Now you can provide some context.

14          MR. POPE:  The difficulty, I think, from the

15  plaintiffs' perspective is we're not getting out of the

16  blocks.  We are many months into this MDL and we have yet to

17  receive a single document produced in this MDL.  We had been

18  provided documents that were produced as a result of a, of an

19  order to compel out of Florida, however, we have yet to

20  receive a document.

21          The concern is that our schedule is such that we're

22  going to not be able to maintain this schedule that Your Honor

23  entered May 31st.  So, for instance, the first test of this

24  was a rolling production to start on August the 18th.  We have

25  been told no documents forthcoming and since this pass, no

9

1   documents were produced as a part of that.  That builds on

2   itself and that's a concern because at this point in time, we

3   have our next deadline due under your order which is the

4   completion of the negotiations of identified custodians.  We

5   used the documents that were being produced on the 18th in

6   order to help us identify for the custodians.  Since no

7   documents were produced, you see how we're starting to already

8   fall behind with regards to Your Honor's order.

9           The issues as it presents and as we've laid out in

10  these papers is the idea of switching now from search terms,

11  which defense had elected to do back in January of this year,

12  and now they've elected, they want to change some search terms

13  to go to TAR 2.0.

14          Now, we don't stand as plaintiffs and say we're

15  opposed.  What we want is we spent six months doing search

16  terms, you've identified responsive documents to our search

17  terms, it's not a tremendous number of documents in this

18  context, and so we should be able to work through that and we

19  haven't been able to work through that and we need to get the

20  documents that we can then start the rest of our discovery

21  with mutual requirements.

22          Going forward, we're happy to continue and we are

23  continuing to discuss TAR 2.0.  We had our vendors meet with

24  their vendors on a conference call.  They had those

25  discussions to help try to bridge the gap and to understand

10

1  that, however, even the TAR 2.0 has been difficult because,

2  according to the ESI order, we should be involved in a

3  protocol.

4        So what's happening now on the TAR 2.0 side of the

5  house is we're completely blocked from understanding what it

6  is they're using to build predictive coding.  We have no idea,

7  and so we don't have anything but bare numbers, this is what

8  this produces, this is what this produces, without

9  understanding how that platform is being built and that is a

10  concern to us.  But for purposes of today, we need documents

11  in order to fulfill the obligations under the schedule order

12  that you entered May 31st.

13        THE COURT:  All right.  Thank you.

14        So for the Exactech defendants, what objection do

15  you continue to have, if any, to the production of these

16  123,321 documents?

17        MR. GONZALEZ:  Your Honor, Ruben Gonzalez for the

18  Exactech defendants.

19        The objection to the 123,000 or so documents, and

20  really, it's the bigger 400,000 number, is that those

21  documents were highlighted in a search term report that the

22  plaintiffs requested to continue negotiations on the search

23  terms.  That search term report was provided sometime in June,

24  I think it was early June, Your Honor, on twelve custodians,

25  not ten.  We were able to collect two additional custodians

11

1   before we ran the search term report.  But that search term

2   report, as we understood it, was to be the basis of actually

3   negotiating search terms.

4        While it's true that we had been meeting and

5   conferring for six months now, Your Honor, that six month

6   period was not all on search terms and what happened is that

7   at some point in April, there was a decision by the plaintiffs

8   not to negotiate search terms without a search term report.

9   So we provided the search term report, but that was sort of it

10  at that point.

11       So really the basis of our objection, Your Honor, is

12  that there hasn't been a meaningful meet and confer on search

13  terms and simply agreeing to produce documents responsive to

14  the plaintiffs' search terms would sort of be unfair given

15  that the only reason we stopped negotiating on search terms in

16  mid April was because the plaintiffs really didn't want to

17  continue negotiating without a search term report.

18       Now, we agree that we would really like to start

19  producing documents.  We think there's a way forward.  We

20  think that way forward is TAR 2.0.  I can talk some more about

21  Tar 2.0 but I want to make sure I'm answering Your Honor's

22  question.

23       THE COURT:  Well, I heard that your objection is to

24  the process of negotiating search terms.  I haven't heard

25  specifically why producing these 123,321 documents are

12

1    objectionable on any basis allowable under the Federal Rules

2    of Civil Procedure, i.e. relevance or proportionality.

3             MR. GONZALEZ:  So our objections to the plaintiffs'

4    search terms, Your Honor, were on the basis that they were

5    overly broad.  They lacked terms and connectors.  They weren't

6    tied to the products at issue in the case.  So the terms

7    themselves are generating documents we think could be over --

8             THE COURT:  Relevant?

9             MR. GONZALEZ:  -- not relevant to the devices at

10   issue in the case.

11            We gave an example in some of our briefing,

12   Your Honor.  For example, the term "wear" exists all by

13   itself, the term "wear" spelled W-E-A-R.  Without that term

14   being either connected through search terms and connections to

15   a device or really to a relevant time period, that's going to

16   generate an over-responsive number of documents.  So what we

17   aimed to do with our proposed search terms back in January was

18   to tie the search terms to the relevant products at issue.

19            So that would be the basis, Your Honor, is that we

20   would, we would be generating an overly broad set of documents

21   and we think there's a way to work around that.

22            THE COURT:  Okay.  So you're objecting on the basis

23   of the request being overly broad.  So I sense that that means

24   not relevant --

25            MR. GONZALEZ:  Yes.

13

1    THE COURT:  -- generating not relevant results.

2    MR. GONZALEZ:  Correct.

3    THE COURT:  I haven't quite yet heard a

4  proportionality argument here so I don't think that's the

5  basis of your objection.

6    MR. GONZALEZ:  No.  At the time moment, Your Honor,

7  it's that the search terms themselves are overbroad on their

8  face, they would lead to the production of documents that are

9  not relevant to the devices at issue in this case.

10    With respect to proportionality, Judge, the reality

11  is that we've got 12 custodians, there will likely be more,

12  but this isn't a proportionality argument at the moment.

13    THE COURT:  I'm glad you agree that proportionality

14  is not an issue.  I'm going to come back to that in a second.

15    MR. GONZALEZ:  Sure.

16    THE COURT:  Let me go to Document 88 which is the

17  stipulated, let me underline the word "stipulated," protocol

18  governing the production of ESI, and by stipulated, it's my

19  understanding that there was an extensive negotiation process

20  months before January 26th when this order was entered.

21    The sole mention of TAR is on page 5 of this

22  document and it talks about notification to the opposing party

23  with ample time to meet and confer in good faith.

24    What it doesn't say is that at the start of the

25  production of ESI, that TAR will be used.  So I'm trying to

14

1   understand how it is that if you stipulated in this protocol

2   that search terms were going to be the way to go, there's an

3   entire protocol set up around search terms, why is it now that

4   you've identified the documents of twelve custodians and

5   suddenly, you'd like to shift gears to TAR.

6          I'm quite sure that TAR was in use and something

7   that you thought was valuable before January when this order

8   was entered during the months before January when you were

9   negotiating it.  I believe this MDL itself was established in

10  October of 2022.  TAR was in existence then and there was

11  never anything more than this one paragraph in this entire

12  stipulated protocol.

13         So talk to me about why, in August, TAR is the way

14  to go.

15         MR. GONZALEZ:  So a couple of things, Your Honor.

16         The order may not reflect it but TAR 2.0 was the

17  subject of extensive negotiations between myself and the

18  lawyers for the plaintiffs I was working with at the time

19  which are different, which are different lawyers than I'm

20  working with now and I think therein lies some, some of the,

21  some of the confusion, perhaps, Your Honor.  There hasn't

22  really been a consistent ESI liaison that the Exactech

23  defendants have been working with on the plaintiffs' side.

24         So TAR 2.0 was extensively negotiated.  I can't

25  speak to what happened prior.  We weren't involved in the

1   early discovery, Your Honor, but I can assure you that TAR 2.0

2   was the subject of extensive discussions.  We began discussing

3   search terms and custodians together at the request of the

4   plaintiffs.  We proposed an initial set of search terms,

5   Your Honor, but TAR 2.0 did come up in meet and confer

6   conferences prior to August and prior to June.

7            At this point, I think the TAR 2.0 is the way

8   forward, Your Honor, mostly because I'm getting to an

9   agreement on search terms, to actually meet and confer with

10  the plaintiffs, to come to an agreement on search terms is

11  going to be tough.  TAR 2.0 --

12           THE COURT:  I agree.

13           MR. GONZALEZ:  It's been difficult, Your Honor.  And

14  for reasons that maybe I'm not aware of but I can -- I will

15  tell you this, that I think that TAR 2.0 is the most efficient

16  and effective way to getting to document production.  The

17  statistics that I shared with the plaintiffs already, they

18  would likely receive more, more documents than their search

19  terms actually hit on.  They would receive more documents,

20  substantially more and the relevance would be stronger

21  initially.  In other words, they would get the most relevant

22  documents because we're relying on continuous active learning

23  and I think that's the goal at this point, Your Honor, it's

24  just to get to document production for everybody.

25           THE COURT:  Okay.  So if I understand you correctly,

1   you believe that the results of the TAR review would be more

2   targeted, more relevant and could lead to a number higher than

3   123,321 documents?

4           MR. GONZALEZ:  Yes.  In fact, it's, it's -- if I

5   may, Your Honor, I would stick to the, if I could, stick to

6   the 400,000 number.  I believe the search terms, search terms

7   hit on about 460,000.  If we project it out, the projected

8   production using TAR 2.0 would be anywhere from 422,000 to

9   over 620,000 documents.

10          THE COURT:  Okay.  So you wouldn't object to a TAR

11  production of over 600,000 documents, but you do object to a

12  search terms production of 123,321 documents?

13          MR. GONZALEZ:  The objection is not based on the

14  number of documents, Your Honor.  The objection is based on

15  the types of documents that would be included on, that would

16  be included as responsive to the plaintiffs' search terms.

17          So it's less about the number and more about the

18  relevance of the documents themselves.

19          THE COURT:  In your assessment?

20          MR. GONZALEZ:  That's my assessment, Your Honor.

21          THE COURT:  Meaning the relevance assessment, the

22  Exactech defendant's writ large prevalence assessment.

23          MR. GONZALEZ:  Well, on the assessment, but the TAR

24  2.0, Judge, the initial sampling that we did on prevalence,

25  it's a pretty strong number on prevalence.  Your Honor, if we

1   had received about a 5 percent prevalence rate, that would

2   have been probably further discussions, but the prevalence

3   rate was over 20 percent.

4           Those documents, the initial documents were coded by

5   me and the relevance of those documents, Your Honor, we can

6   project would be pretty close to what, to what's actually

7   appropriate in this litigation.

8           THE COURT:  Am I correct in that your papers

9   indicate that there was essentially a manual review --

10          MR. GONZALEZ:  That's right.

11          THE COURT:  -- of the 400,000 some documents?

12          MR. GONZALEZ:  That's right.

13          So there's a difference between TAR 1.0 and TAR 2.0.

14  There are a few key differences that are really important.

15          In TAR 1.0, TAR 1.0 relies on what's called a seed

16  set.  So you have to train the system based on that initial

17  seed set.

18          In TAR 2.0, it's continuous active learning.  So the

19  way this system kicks off is there's a prevalence document,

20  it's called an estimation sample.  It's a sample of documents

21  from the total universe that are reviewed, each document just

22  on the four corners.  So it doesn't -- you don't look at

23  whether there might be a family document, for example,

24  Your Honor, that might be relevant.  You're just looking at

25  the four corners of each document.  If it's relevant, you move

1   forward and you get that estimation sample and for us, again,

2   it was, I believe it was 20 or 25 percent.  From there, the

3   system begins generating batches of documents for review.

4   Each time a reviewer determines the document is relevant, it

5   trains the system on responsiveness and it's a continuous

6   system.

7           The other difference between TAR 2.0 and TAR 1.0 is

8   that validation is happening with each batch and then there's

9   a final validation at the end.  So it's a pretty robust

10  advancement over TAR 1.0.

11          THE COURT:  And all of this was available in January

12  when this order was entered, this stipulated ESI protocol?

13          MR. GONZALEZ:  All of this meaning TAR 2.0?

14          THE COURT:  TAR 2.0.

15          MR. GONZALEZ:  Yes.

16          THE COURT:  Okay.  Thank you.

17          MR. GONZALEZ:  You're welcome.

18          THE COURT:  Any response from the plaintiffs?

19          MR. POPE:  Well, Your Honor, I just reiterate that

20  we're just in the dark here.

21          I mean I listened to the TAR 2.0 and all that

22  they're, being put together, but the ESI order clearly sets

23  out that we are to be a part of the protocol that helps

24  generate whatever the TAR 2.0 is generating.  We have no idea.

25  All we get is a number, this is what it generated.  We don't

19

1   understand how, you know, the search process is going as part

2   of TAR 2.0.

3          The only piece that I just want to touch on is the

4   idea behind these search terms and the process and how the ESI

5   works is that we exchange those search terms and then they run

6   them, we get metrics to understand what is overly broad and

7   then we have a negotiation based upon that to narrow the

8   field, but that requires data in order to do that that and we

9   were never provided that data.  The only thing that happened

10  in July was we ran a hit report.  This is how many hit per

11  search term.  We weren't even provided at that point in time

12  what the denominator, what the entirety of the actual

13  documents that had been searched.

14         So it's impossible to just grab out of the air a

15  term and a connector in order to be able to narrow something

16  down that has any meaning to it without having some

17  understanding of what the data means as it's applied to

18  whatever search terms they're using.

19         So I just wanted that as part of the context,

20  Your Honor.

21         THE COURT:  All right.

22         MR. GONZALEZ:  Real quickly.

23         THE COURT:  Super quick.

24         MR. GONZALEZ:  Okay.  Your Honor, if I may, just the

25  notion that we were going to be providing analysis all along

1   the way between January and June, the custodians weren't, the

2   initial really twelve custodians weren't agreed upon until

3   sometime in April and then the documents were collected and

4   processed.  So there wouldn't be a way to provide analysis

5   without the custodian document file.

6          And just, just to be clear, Your Honor, if I wasn't

7   so clear before, the reality is that the negotiations, the

8   meet and confers, on search terms that we've had, they've been

9   unproductive, and I believe the TAR 2.0 is the right way

10  forward.  It sort of takes away, sort of eliminates some of

11  the issues that the attorneys may have with the history which

12  isn't worth getting into, but TAR 2.0 is an efficient,

13  effective and productive way forward to actual document

14  production.

15         THE COURT:  All right.  Thank you very much.

16         For plaintiffs, let me just ask you this.  I believe

17  there was a line in the status report in your portion of the

18  papers that indicated that you wouldn't object to the use of

19  TAR 2.0 going forward, meaning not with the documents that

20  have already been identified for the twelve custodians but for

21  any additional custodians, you would not object.

22         Is that an accurate statement?

23         MR. POPE:  That is correct, Your Honor.

24         THE COURT:  Okay.  So I want Exactech to produce the

25  123,321 documents that have been generated by the plaintiffs'

21

1   search terms.

2          And if I understand correctly, these are the search

3   terms that are listed in your papers, plaintiffs, at 371-5?

4          MR. POPE:  That is correct, Your Honor.

5          THE COURT:  Okay.  Yes.  So Exactech needs to

6   produce those documents.  However, if, in fact, you are not

7   objecting to the use of TAR going forward, plaintiffs, and if

8   you, Exactech defendants, believe that TAR 2.0 would help you

9   in identifying documents from additional custodians, then,

10  yes, that is the process that -- excuse me -- you are

11  encouraged to use the TAR process to more quickly get to those

12  documents.

13          I do think that -- my concern here is that rather

14  than just producing the documents, the Exactech defendants are

15  introducing the TAR process sort of after the fact.  The

16  reason why I started off with Rule 26 and those objections is

17  because it wasn't entirely clear to me from the papers what

18  your specific objections were to producing the documents.  It

19  seems as though your objections were to the history and nature

20  of the negotiations, whether or not search terms were

21  appropriately agreed upon, whether or not there were

22  reasonable versus unreasonable requests for analytics.  I

23  never heard of and I still haven't yet heard of a firm,

24  substantive objection to providing the documents.

25          So you are going to produce the documents that I've

22

1   just identified but I take your point that TAR, yes, can be a

2   useful tool.  Your protocol does allow for the use of TAR.  It

3   just hadn't been used up until this point or it hadn't been

4   discussed in detail.  I think plaintiffs now have a better

5   understanding of what it can do after the meeting with the

6   E-discovery vendor, and maybe your conversations will now be

7   more productive, A, given that you're not, you will have

8   gotten documents for the first twelve custodians.

9            Just remind me, was there to be an maximum number of

10  custodians or has that not been decided yet?

11           MR. POPE:  That has not been decided yet.  That was

12  the September 1st deadline date, that was the import there.

13           THE COURT:  Yes.  I'm going to have to get back to

14  the order because August 18th, I think, was the date for the

15  initial production.

16           In ordering the production of these 123,321

17  documents, I also need to talk about a deadline by which that

18  has to happen.

19           I'm going to ask the plaintiffs what they believe is

20  a reasonable deadline.  Don't say today.

21           MR. POPE:  Your Honor, my understanding from the

22  papers, I mean, again, reading where defendants are, these had

23  been identified, they've been reviewed, so they should be

24  fairly close to being able to be produced.  I would suggest

25  that those be produced within 15 days.

23

1        MR. GONZALEZ: Your Honor, so let me correct that

2   understanding.

3        Those documents have not been reviewed and so one of

4   the questions I have is I suspect that your order would not

5   include documents that are privileged.

6        THE COURT: Of course not. I'm talking about

7   non-privileged responsive documents.

8        MR. GONZALEZ: So just to be clear, Your Honor, we

9   would review the documents, we would have to review the

10  documents for responsiveness or privilege, and then we could

11  work to get those produced. I would commit to doing a rolling

12  production.

13       THE COURT: Well, you had previously committed to a

14  rolling production and we've already missed that date, so I

15  would like to understand in a finite time period what do you

16  believe to be a reasonable time period to produce these

17  documents.

18       MR. GONZALEZ: I would ask Your Honor for at least

19  30 days.

20       MR. POPE: That's fine, Your Honor, as long as we

21  address the other issue with regards to the custodians in the

22  order. We're going to need to be able to review them.

23       THE COURT: Okay. One thing at a time.

24       So you would like 30 days to produce your 123,321

25  documents.

24

1          MR. GONZALEZ:  To review and produce, that's
2     correct, Your Honor.

3          THE COURT:  And you have that, fine.

4          So I have no calendar in front of me.  What is
5     30 days from today?

6          MR. GONZALEZ:  September 21st, Your Honor.

7          THE COURT:  Okay.  Is that a Friday?

8          MS. KESSLER:  Thursday.

9          THE COURT:  Okay.  I'll give you September 22.

10          MR. GONZALEZ:  Thank you.

11          THE COURT:  The Friday.  Okay.  So that's part one.

12          Part two, let's look at the rest of the discovery
13     order, at 291.

14          Mr. Pope, were you starting to say that there was a
15     different issue to be addressed?

16          MR. POPE:  Sorry, Your Honor.

17          With regards to kind of the building blocks of the
18     schedule, the way it had been negotiated for purposes of what
19     we submitted to Your Honor, that ultimately got entered on
20     May the 31st, is that we would have an opportunity to receive
21     rolling production on August the 18th to allow us to review
22     same for two weeks so that we can have a discussion about
23     whether or not there are other custodians that needed to be
24     added to the list.  We have no documents so that plan is kind
25     of by the wayside.

25

1          Given the fact that we now have an order where there

2    will be a production September 22nd, we would submit,

3    Your Honor, for two weeks thereafter to be able to finalize

4    the custodian list.

5          THE COURT:  Any objection?

6          MR. GONZALEZ:  I don't have any objection to that,

7    Your Honor.  I think we've got 14 custodians at the moment.

8    We're prepared to agree to a few more.  I suspect that after

9    that time, if there are additional custodians, there's a way

10   to work through it that's spelled out in the order.  So no

11   objection.

12         THE COURT:  I'm sorry, 12 or 14?

13         MR. GONZALEZ:  So we've collected and processed data

14   on twelve.  Since then we've offered two additional custodians

15   and we have more that we're, that we've agreed to.  I think

16   the initial list, and plaintiff can correct me, I think their

17   initial list was for 35 custodians so we're at 14.

18         THE COURT:  Right.  And your initial production was

19   ten of those?

20         MR. GONZALEZ:  It will be twelve.

21         THE COURT:  All right.  So you have no issue with

22   two weeks later.  Tell me what two weeks after September 22nd

23   is, please.

24         MS. KESSLER:  October 6th.

25         THE COURT:  Sure.  October 6th.

26

1          MS. KESSLER:  That's Friday.

2          THE COURT:  Right.

3          Okay.  I mean it is clear that I am going to need to

4    amend this order.  So I just want to make sure that we are

5    dealing with all the different steps that we need to deal

6    with.

7          I believe that the September 22nd date is

8    paragraph 11 on page 6 of the May 31st order at 291 and the

9    agreement to the final list of Exactech custodians is now

10   October 6th.  Is that consistent with your understanding?

11         MR. POPE:  Yes, Your Honor.

12         MR. KANUTE:  Yes.

13         MR. GONZALEZ:  Yes.

14         MR. KANUTE:  That's correct, Your Honor, yes.

15         THE COURT:  Thank you.

16         So now the defendant's substantial completion of

17   non-custodial document production, does that date need to be

18   amended?

19         MR. POPE:  Well, I'll speak to it from the

20   plaintiffs' side.

21         We have yet to receive any such production.  So to

22   the extent -- and I don't know where they stand on gathering

23   those documents.

24         THE COURT:  Well, it says substantial completion so

25   I will find out what the status is.

27

1          MR. POPE:  Thank you.

2          MR. GONZALEZ:  Yes.  So just to note, Your Honor,

3     many of those documents have been produced in the Florida

4     coordinated proceeding which have been also produced in the

5     MDL.

6          At this time, I don't see a need to change that

7     October 3rd deadline.

8          THE COURT:  Okay.  Then we won't.

9          Any issues, Mr. Pope?

10         MR. POPE:  No, Your Honor.

11         THE COURT:  Okay.  And we're still then, in light of

12    the changed dates for this initial production of the twelve

13    agreed upon custodial files, we're still on track for the

14    November 20th date to complete that production?

15         MR. GONZALEZ:  Yes, Your Honor, I think we can do

16    that.

17         THE COURT:  Okay.  All right.

18         Any other changes or slight amendments?  I was

19    concerned that this entire discovery plan needed to be

20    rewritten.  It does not.  Any other changes to any of the

21    dates in the discovery plan, putting aside your concerns about

22    bellwether?  That's slightly different.

23         MR. GONZALEZ:  None from a discovery perspective,

24    no, Your Honor, from the Exactech defendants.

25         THE COURT:  Okay.

28

1       MR. POPE:  Your Honor, we would submit that we would

2  need to include one item, dealing with a date to come to terms

3  with a protocol dealing with the TAR 2.0 going forward between

4  the parties, and we would submit that we would need to do that

5  and notify the Court that we have completed that.

6       THE COURT:  Mr. Gonzalez?

7       MR. GONZALEZ:  Yes.  That would be fine, Your Honor.

8  So -- let me just look at this.

9       THE COURT:  Yes.  Your TAR paragraph in Document 88,

10  your stipulated protocol talks about notification with "ample

11  time" which is appropriately vague, I guess, to accommodate

12  things like this, but the vagueness, I think, has been perhaps

13  the cause of some of the dispute here.

14       So to the extent you can come up with a stipulated

15  protocol with the use of TAR that's a little more specific, I

16  think that that would help things going forward.

17       MR. GONZALEZ:  I'll tell you that after working with

18  Ms. Wall, the plaintiffs' ESI liaison, particularly on that

19  30(b)(6) recently, Your Honor, I'm confident we can do that

20  and come to an agreement.

21       THE COURT:  Okay.  Sure.  Is there a proposed date

22  for this agreement?

23       MR. POPE:  Your Honor, we would submit

24  September 22nd, the same time which the production with

25  regards to the search terms is taking place.  Again, it's

29

1  30 days.

2          THE COURT:  Mr. Gonzalez?

3          MR. GONZALEZ:  I think that should be fine.

4          THE COURT:  All right.  So we'll further amend this

5  order to include that by September 22, 2023, the parties will

6  come to an agreement on a protocol for the use of TAR 2.0 in

7  searching for the files for additional custodians after the

8  initial twelve?

9          MR. GONZALEZ:  Twelve.

10          THE COURT:  Okay.  Any other ESI related issues

11  before I go back to the rest of the status report?

12          MR. POPE:  Not from plaintiffs, Your Honor.

13          MR. GONZALEZ:  Nothing, Judge.  Thank you.

14          THE COURT:  Okay.  Now, I guess, generally speaking,

15  are there any other issues to be covered for any other

16  disputes that the parties believe that they have?  I'll start

17  with the defense.

18          MS. SHARKO:  If we could talk about the bellwether

19  issues either on or off the record with Your Honor, it's a

20  real problem for us and we need your help.

21          THE COURT:  Understood.

22          MR. POPE:  No objection.  We're not objecting to

23  having an off-the-record conversation.

24          THE COURT:  Well, we don't have off-the-record

25  conversations about bellwether trial plans here, but I will

1    say this.

2            The other documents that I forgot to mention mainly

3    because they were not revolving around this ESI dispute, yes,

4    the parties proposed a bellwether plan here at 374 which was

5    ultimately denied by Judge Garaufis in light of Judge Keim's

6    ruling in Florida, and then I guess just last week, at

7    Document 396 was your filing informing us about your filing in

8    Florida asking Judge Keim for additional time to submit a

9    modified order or a modified agreed upon order.

10           Has she yet ruled on that motion?

11           MS. SHARKO:  No, unfortunately.  We've been trying

12   to speak with Judge Keim for a number of weeks now.  We

13   haven't had a case management conference since before Science

14   Day and we got a notification from her judicial administrator

15   this morning saying that Judge Keim was away until

16   September 5th and she wouldn't see our motion until then, and

17   our motion asks for an extension until September 4th.

18           THE COURT:  Sure.  I mean I -- there is nothing that

19   this court can do about Judge Keim's decisionmaking on any

20   motions that are filed in that court.  She, of course, has all

21   the prerogative to decide the motions as she sees fit.  She

22   did so with the proposed bellwether plan.  And Judge Garaufis

23   as, you saw, essentially said well, let me know what happens

24   in Florida and then you can peg your proposed plan to that.

25   Of course, that's not a direct quote but that's essentially

1  what his order said.

2        So it's difficult for me here in this vacuum to talk

3  about bellwether plans because unless you're telling me that

4  there's some issue with this discovery order which was sort of

5  intimated at in the papers, there's not a discussion that I

6  can have with the parties about that.

7        MS. SHARKO:  So here's the problem and I think I

8  speak for everybody.  We're in the unprecedented situation of

9  all of the plaintiff lawyers and the defense lawyers agreeing

10  on this bellwether plan which was structured around

11  Your Honor's discovery order of May 31st.  We heard you, you

12  spoke clearly to us, and you gave us a to-do list and we knew

13  then what we had to do and when we had to do it.

14        That order came out after the Florida bellwether

15  motion was argued but before it was ruled upon and so after

16  Judge Keim issued her ruling on the bellwether motion in

17  Florida.  Do I wish we all had been in agreement and rowing

18  the same boat before then?  Absolutely but, you know, it takes

19  some people longer than others, I guess, as my mother would

20  say, but we finally got there, I think, motivated, in part, by

21  the order that she did submit.

22        So we're all together now with this plan which we

23  think is really efficient and that's important considering the

24  status of the company.  It's a really small company.  And it's

25  important because the bellwether plan is built around

1    Your Honor's discovery order.

2         So if we go off in two different directions, you and

3    Judge Garaufis will be ruling on hips and knees, Judge Keim

4    will be ruling on hips and knees, and if we use the MDL

5    version of the order here, it will be an orderly process

6    because we'll complete discovery and then we'll do the

7    bellwethers but it won't be in Florida because the Florida

8    order will have us trying cases well before discovery is

9    completed here which means that -- I don't mean to be doom and

10   gloom -- it's just going to be discovery chaos which is going

11   to be really expensive and burdensome for my client and also

12   for the plaintiffs because the plaintiffs, not that I should

13   sing their song, but they're going to be in the position of

14   trying cases long before discovery is completed under your

15   plan and we just can't do your plan any faster.  As you can

16   see, we're --

17        THE COURT:  Well, I was going to ask is the proposal

18   that we move all of these dates up?

19        MS. SHARKO:  No.  No.  We can't -- that would be

20   impossible.

21        THE COURT:  Right.

22        MS. SHARKO:  And so since, I mean my brothers here

23   would probably say we don't have enough time to do that but

24   they're working hard, we're all working hard.

25        So given that, we thought this was the best plan and

33

1   we'd love the opportunity to explain that to Judge Garaufis in

2   addition to you and Judge Keim.  We haven't been able to get a

3   hearing with Judge Keim.  It doesn't look like we'll be able

4   to until after September 5th.  So that's why we thought if all

5   the Judges could get together and we could explain this and

6   explain the importance of your order, which I don't think

7   Judge Keim fully understands because we haven't explained that

8   to her, in all candor, then we thought maybe we could make

9   progress.

10          MR. POPE:  To address, I guess, where I think your

11  question was, Your Honor, is there a conflict and our concern

12  on the plaintiffs' side right now as it stands with

13  Judge Garaufis's text order is it may be a conflict with your

14  order because he suggested, and, again, I'm not certain what

15  he was intimating, but he suggested that we needed to

16  coordinate our schedule with that of Florida, however, the

17  Florida current bellwether order puts trial starting February,

18  May and every month thereafter --

19          THE COURT:  Of 2024.

20          MR. POPE:  -- starting next year with your order

21  showing that discovery doesn't end in the MDL until

22  August 30th.  So it's a somewhat of a balancing act here

23  having trials move forward without the core discovery being

24  completed if we were are to participate somehow or change the

25  schedule that's currently in place.  That's the only thing --

1 we need real clarification as to that.

2       THE COURT: All right. Well, I can't speak for

3 either Judge Garaufis or Judge Keim and neither Judge Garaufis

4 and I could speak for Judge Keim. As a practical matter, that

5 is a completely different jurisdiction and as I said before,

6 she has the right to issue orders that she believes are right

7 for the cases that are before her.

8       With respect to my discovery order, I haven't yet

9 heard a proposal as to how to change it. You all have soundly

10 rejected the let's-move-all-the-dates-up proposal that I just

11 said. Going the opposite way would extend the dates out which

12 seems counterintuitive based on what you just described for

13 the bellwether trial schedule.

14       So it seems to me that, yes, there needs to be some

15 conversation around the bellwether trial plans either here or

16 more likely than not with Judge Keim because Judge Garaufis

17 has clearly indicated that he wants to coordinate with

18 Judge Keim's plans. For now, you have a motion pending to

19 essentially ask her, again, to modify her bellwether plan

20 except it appears to be a joint, a strongly worded joint

21 motion that will maybe explain in further detail how you

22 believe this discovery order impacts or is impacted by that

23 trial schedule.

24       I honestly don't know what to say because you

25 haven't, you haven't asked me to change my schedule and you've

35

1   rejected my attempts to do the same in a way that seems

2   impossible as you indicate, Ms. Sharko.

3          So I think for now, this may just continue to be an

4   open question but you do have a discovery order and you have

5   productions to be done and you all have agreements to make on

6   custodians.

7          MS. SHARKO:  We understand.  We don't want your

8   order changed.  We're working hard with your order.  We would

9   really like to have a hearing across jurisdictions.  We

10  appreciate that we have to ask Judge Keim and Judge Garaufis

11  for that as well as you, so we've asked you but we know you're

12  not the only person.

13         THE COURT:  Right.  And I -- and to be clear, all of

14  the Judges have seen your requests for a joint conference.

15  Again, to me, it seemed premature at the start of this

16  conversation.  You've laid out the reasons why you believe it

17  to be something that needs to happen.  There will be a record

18  of this conversation, of course, that all of the Judges can

19  review and if it's decided that that will be different, that's

20  fine.  Until that point though, I have to continue on where we

21  are in the status quo which is making sure you produce the

22  documents to plaintiffs, they have a basis to select their

23  additional custodians, and continue moving on unless and until

24  something changes.

25         It sounds to me like the dates in the discovery

36

1  order are not being moved up.  In other words, none of the
2  dates will be earlier than they currently are.  So perhaps
3  then the only question is how much further out they would need
4  to change based on this joint status conference that you
5  believe will solve all the bellwether concerns that you
6  phrased.
7          MS. SHARKO:  Okay.  Thank you.
8          THE COURT:  All right.  Anything else from
9  plaintiffs on that point?
10         MR. POPE:  No, Your Honor.  Thank you.
11         THE COURT:  All right.  So besides the ESI issues
12 which we hopefully have resolved for now, and besides the
13 bellwether issues which are not currently resolvable, is there
14 anything else that you want wanted to discuss today?
15         MS. RELKIN:  I have a very noncontroversial,
16 actually pleasant issue which is we all made Law Review.  May
17 I present it to the Court and can you provide a copy to
18 Judge Garaufis?
19         I just happened upon a Law Review about MDLs and
20 diversity initiatives in Texas Law Review and the Exactech
21 litigation was featured in the very beginning.  So I thought
22 that was kind of neat.  I shared a copy with defendants.
23         THE COURT:  I will let Judge Garaufis know and I
24 appreciate you describing it as noncontroversial as it is.
25 Thank you.

37

1          MS. RELKIN:  It's good.

2          THE COURT:  It is fantastic.  Thank you.

3          Anything else from anyone else?

4          MR. KANUTE:  Your Honor, if I can raise one issue.

5          We did put in the joint status report a very brief

6    update on some of the state court litigation and I mentioned

7    Illinois a bit earlier.

8          THE COURT:  You did.

9          MR. KANUTE:  So, Your Honor, with the growing number

10   of cases in Illinois, we do face a challenge that's a little

11   bit different than some of the issues you've been told about

12   today and that is the plaintiffs' counsel in Illinois is

13   intending to move forward with all discovery outside of

14   whatever, outside of your order and whatever orders are in

15   place in Florida which will be a huge challenge for Exactech.

16         We have filed -- I just want to make the Court aware

17   we have filed a motion for discovery coordination and to stay

18   non-case-specific discovery.  That was filed on June 30th.

19   The plaintiffs have responded and they're opposed to that and

20   claim that they should be able to manage that litigation

21   which, so Your Honor knows, is all consolidated in front of a

22   single Cook County Judge.  We do at least have that and we've

23   got all those cases transferred before Judge Scott McKenna and

24   then we filed a reply.  I actually have a status hearing

25   before Judge McKenna on Thursday in which this is going to be

38

1   addressed.

2         To be clear, I'm not suggesting we stay discovery in

3   Illinois.  I made clear to Judge McKenna that we have to take

4   plaintiffs, we have to take surgeons, but to get discovery on

5   common issues which was discussed here today, you know, and

6   having to do that in Illinois for a very small number of

7   plaintiffs which will, in all candor, probably inhibit our

8   efforts here in the larger scale, we really would like

9   coordination there.  I'm not sure if Your Honor or

10  Judge Garaufis is willing to do it, but if there was an

11  opportunity to reach out to Judge McKenna who did not have

12  these cases at the time of Science Day, otherwise, we would

13  have asked Your Honor for leave to invite him to Science Day

14  as well to apprise him of the magnitude of this litigation,

15  but whether it's an e-mail or a call or whatever Your Honor

16  sees fit, it would go a long way toward helping us in the

17  larger picture to get just a bit of coordination in Illinois.

18         I think, I believe in our recent filings,

19  Your Honor, we may have sent you the motion that we filed in

20  Cook County.  I'm happy to also provide you with the response

21  filed by plaintiffs and the reply that we filed.  I can get

22  that done either by the end of today or first thing tomorrow

23  morning.  But we do have this status at which I'm not sure

24  what Judge McKenna is going to do in Chicago but we --

25         THE COURT:  Tell him what happened today.

39

1          MR. KANUTE:  Yes.

2          THE COURT:  You can tell him what happened today.

3          MR. KANUTE:  I will, Your Honor.  I will intend, if

4   I have the opportunity, to apprise him of everything I can

5   about what's going on here so he understands the larger

6   picture.  I just wanted to make Your Honor aware of that

7   challenge that we're facing.

8          THE COURT:  Understood.

9          Mr. Gonzalez?

10         MR. GONZALEZ:  And, Your Honor, just one brief

11  update along those same coordination lines, the joint status

12  report also reflects the Collum-Bradford case that is in

13  California and we're working with Mr. Pope, the co-lead for

14  plaintiffs.  We're still very hopeful that we can coordinate

15  discovery on those issues.  Your Honor, I think we're before

16  the Special Master on Thursday.

17         I think the primary dispute there is regarding

18  *qui tam* documents in the, the *qui tam* in the Wallace

19  litigation.  So we're hopeful that we can continue to work

20  through those issues and happy to answer any questions on

21  that.

22         THE COURT:  First, let me hear from Mr. Pope who has

23  been invoked at least in the Collum-Bradford case.

24         MR. POPE:  Sure.

25         Your Honor, I think we've laid this out in about

40

1   every filing that we've had with you from the beginning of

2   this MDL.

3           The <u>Collum-Bradford</u> case deals with multiple issues

4   associated with the design.  It is a thin tray design which is

5   the subject of the *qui tam*.  Defense has taken the position

6   that the *qui tam* issues and the thin tray issues are not a

7   part of this MDL.  We don't agree with that, however, that has

8   yet to be resolved.  So the idea that my client is going to

9   agree to coordinate with this court all of the discovery that

10  she's entitled to on an issue that very well this court may

11  decide is not a part of the MDL, it just doesn't make sense.

12  It's a, you know, it's a square peg in a round hole.

13          So we have briefed it fully.  It's -- the briefing

14  is complete.  The referee will make the decision.  We have --

15  the decision will be made by August 31st and hopefully we can

16  put this particular issue behind us.

17          There is one other issue.  We did submit as a part

18  of the joint report, Your Honor, that -- we requested that

19  there be another conference hopefully sometime in September.

20  Given what the Court has done here today and the time frames,

21  we just submit that October may, we suggest October if the

22  Court has time to hear us on the conference after the

23  production dealing with the protocol and the other issues that

24  the Court outlined.

25          THE COURT:  Well, I did think it made sense for us

41

1   to have another conference.  I think we're on, what, every two

2   months somewhat?

3           MR. POPE:  I think that's about right.

4           THE COURT:  Yes, which would take us to October, and

5   I thought it might make sense to do it after some of these

6   deadlines that we just talked about.

7           For now, that is a conference with just me, just to

8   be clear.  I hear you and the record will reflect your request

9   for a joint conference but, ultimately, I have to keep the

10  discovery moving in this case.  So whether it's just me or

11  Judge Garaufis chooses to join, that's not something that I

12  can speak on.  For now, this is to go through and advance the

13  conversation on the issues that we discussed today with

14  respect to ESI and other discovery matters.

15          So let me talk to my intrepid team about potential

16  dates.

17          (Pause.)

18          THE COURT:  All right.  So the first proposed date I

19  have is Tuesday, October 17th.  Tuesday, October 17th, at

20  2:00 p.m., and that would be by video for now.

21          Is that date and time acceptable?

22          MS. RELKIN:  I'm going to be out of the country on

23  that day.  I mean, if other people can do it --

24          THE COURT:  All right.  That week or that day?

25          MS. RELKIN:  That week.  The week before or the week

42

1   after would work.

2           THE COURT:  Well, I want it to be a date that is

3   after the 6th, right, because that was the date that was

4   modified in the order.  Let's try again.

5           MR. KANUTE:  Your Honor, if the week of October 9th,

6   maybe later that week if there's a possible date in there.

7           MR. POPE:  That's good for plaintiffs, Your Honor.

8           THE COURT:  Sure.  How about Thursday, October 12th,

9   at 2:00 p.m., by video.  Did I say Tuesday?  Thursday.

10          MR. KANUTE:  That's fine with defendants.  Did you

11  say 2:00 p.m.?

12          THE COURT:  2:00 p.m., yes.

13          MR. POPE:  That's fine with plaintiffs, Your Honor.

14          I assume you need the status report ten days out?

15          THE COURT:  Please.

16          So Thursday, October 12 at 2:00 p.m. by video with

17  the standard status report before that.

18          Any other issues before we adjourn for today?

19          MS. RELKIN:  One very minor.  Just some personnel

20  changes on the committees in terms of a couple of people have

21  left their firms so they've been replaced by other individual

22  at the firms.

23          So from the Science Committee, Ilana Wolk had left

24  the firm of the Fuchsberg office and Eli Fuchsberg, who is

25  here today, we are told that he agreed to be a member of the

43

1    Science Committee and would like to take that seat.

2            On the Bellwether Committee, Arati Furness has left

3    her firm, the Forester Haynie firm, and Matthew McConnell, who

4    is also here today, has been filling in for that seat so we

5    would like to formalize it.

6            THE COURT:  Okay.  I think you should submit a joint

7    proposed order indicating the change in the lineup and

8    explaining, and also including biographical information about

9    the proposed members.

10           MS. RELKIN:  And not to beat a dead horse, because I

11   didn't speak up before about the bellwether -- it's not dead.

12   It's a pending horse.  The dilemma we have, I know

13   Judge Garaufis's docket order said conform to Florida and, you

14   know, of course, we're waiting to hear when Judge Keim gets

15   back, but we don't want to get behind on our own bellwether.

16   We worked out -- Ms. Sharko and I spent a lot of time working

17   together and all the parties to work out a plan.

18           So just whether there's some way to have a date

19   where we check in with Judge Garaufis in case we can't -- if

20   Judge Keim doesn't hear from us on this joint conference,

21   that -- you know, we submitted a plan in accordance with the

22   order of submitting it by August 11th, we submitted it earlier

23   and now it's kind of, it was denied but pending subject to

24   Florida.

25           I understand how Your Honor can't dictate what

1    Florida does but in a certain way, the MDL, which has far more

2    cases, is in a little bit limbo because of what's going on in

3    Florida.  So maybe we can have a check-in date with

4    Judge Garaufis, phone or zoom conference, something.

5           THE COURT:  I can't speak for his schedule.  I truly

6    cannot.

7           What I can do is -- as I mentioned, the record

8    clearly reflects all of your concerns which will also be

9    reflected in the minute entry here.  The transcript will be

10   available.  He and I communicate regularly about this case

11   anyway.  He happens to be away this week.  So in the course of

12   our regular communications, all of this will come up.

13          MS. RELKIN:  Okay.

14          THE COURT:  Whether that leads him to have a

15   conference to discuss these issues, I couldn't say, but it is

16   not as though the Court isn't going to be aware of them.

17          MS. RELKIN:  Terrific.  Thank you very much,

18   Your Honor.

19          THE COURT:  Anything else from plaintiffs?

20          Ms. Kessler, I don't know if you need to do your

21   update.  I don't know how many people in the audience are

22   counsel for individual plaintiffs.  I know you usually have

23   your video audience for that.

24          MS. KESSLER:  Yes, Your Honor.  I'll be extremely

25   brief.

45

1          We continue to update our plaintiffs' counsel list

2     which we believe maintains all counsel of record for cases

3     that are filed.  We do that weekly.

4          If any counsel believes that they have been not part

5     of that list, they can e-mail

6     ExactechMDLliaison@RobbinsKaplan.com, and any questions that

7     counsel have for the plaintiffs' liaison counsel are best

8     e-mailed to that same address.

9          If there's questions that counsel have about MDL

10    centrality and submitting their short run complaints, for

11    example, or the plaintiff fact sheets or the preliminary

12    disclosure forms, that e-mail address is

13    Exactech@BrownGreer.com.

14         Thank you, Your Honor.

15         THE COURT:  Thank you.

16         Anything else from the Exactech defendants?

17         MR. KANUTE:  Nothing else today, Your Honor.

18         THE COURT:  All right.  It's nice to see everyone in

19    person.  We'll go back to our videos as the colder weather

20    sets in here in New York and with that, we are adjourned.

21         Thank you, everyone.

22         MR. KANUTE:  Thank you, Judge.

23         MR. POPE:  Thank you, Your Honor.

24         (Matter concluded.)

25